In the Matter of the Supervised Administration of the ESTATE OF Martha J. WADE, Deceased.

Steven Grubb, Michael Grubb, and Charles Grubb, Appellants–Respondents,

v.

Estate of Martha J. Wade, Appellee–Petitioner.

No. 49A02–0105–CV–276.

Court of Appeals of Indiana.

May 29, 2002.

Bryan Lee Ciyou, Ciyou & Dixon, P.C., Indianapolis, IN, Attorney for Appellants.

Jerry Garau, Findling Garau Germano & Pennington, P.C., Indianapolis, IN, Attorney for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Respondents, Charles W. Grubb, Michael J. Grubb, and Steven A. Grubb (Charles, Michael, Steven, individually, and "the Grubbs" collectively), appeal from the trial court's Order Determining Ownership of Assets.

We affirm.[1]

---

1. The Petitioner/Appellee's request for oral argument is hereby denied.

*ISSUES*

The Grubbs raise two (2) issues for our review, which we restate as follows:

1. Whether a presumption of fraud attaches to transactions that benefit a fiduciary.

2. Whether a fiduciary's family members can retain the benefits of a fraudulent transaction.

*FACTS AND PROCEDURAL HISTORY*

On February 18, 1999, Jack Eads (Eads), the Special Administrator for the Estate of Martha J. Wade, filed a Petition to Restore Assets of Estate. On August 22, 2000, a trial was held and, after hearing the evidence, the trial court took the matter under advisement. The trial court also granted the Grubbs' request for written findings on this date. We adopt the facts as set out in the trial court's findings in its Order Determining Ownership of Assets on March 5, 2001.

1. On January 12, 1983, Martha "Juanita" Wade (Mrs. Wade) executed her last will and testament and left her residual estate to her husband, Robert Wade. The Wades had no children. In the event that Wade's husband did not survive her, Wade's residual estate was to be distributed in equal shares to her nieces and nephews.[2]

2. Robert Wade died in 1990.

3. On December 13, 1994, Mrs. Wade executed a general power of attorney appointing her nephew, Charles [Grubb], as her attorney in fact.

4. At the time that Charles was appointed as her attorney in fact, Mrs. Wade was 83 years old and living alone in Mooresville, Indiana.

5. Mrs. Wade was unsophisticated in regards to financial matters. She had depended upon her husband [who] handled their financial affairs.

6. Following the death of her husband, Mrs. Wade depended on [the Grubbs] for assistance with household tasks. [The Grubbs] occupied a position of trust and responsibility with respect to Mrs. Wade. Mrs. Wade told Dorothy Wade that Charles Grubb helped her with investments. Mrs. Wade also told Dorothy Wade that everything was to be divided equally among fifteen nieces and nephews.

7. In late December of 1997[,] Mrs. Wade became ill. She remained in poor health, confined primarily to hospitals and nursing homes, until her death in November of 1998.

8. Following Charles Grubb's appointment as Mrs. Wade's attorney in fact in December of 1994, a series of transactions took place directly benefiting Charles Grubb and his brothers and reducing the assets of Martha Wade's estate.

9. Following Charles Grubb's appointment as Mrs. Wade's attorney in fact, Charles Grubb and his brothers became either the co-owners or co-beneficiaries on every annuity or life insurance policy owned or purchased by Mrs. Wade.

10. At the time Charles Grubb became Mrs. Wade's attorney in fact, Mrs. Wade owned an annuity[,] which she had purchased from the First Penn Pacific Life Insurance Company on August 27, 1991 for $63,396.19. The primary beneficiary of the annuity was Mrs. Wade's estate. In September of 1995, after Charles Grubb had been appointed Mrs. Wade's

---

2. The nieces and nephews were identified by name in the will. They are Mark A. Wade, David E. Wade, John W. Wade, Robert J. Wade, James P. Wade, Richard R. Wade, Michael R. Wade, Mary M. Youngs, Charles W. Grubb, Jr., Steven A. Grubb, Michael J. Grubb, Janice A. Nichols, Jack E. Eads, Norma J. Salmon, and Barbara J. Wright.

attorney in fact, Mrs. Wade's estate was removed as beneficiary and replaced by the respondents. At the time of Mrs. Wade's death, the First Penn Pacific annuity had a value of $98,106.35.

11. On June 28, 1994, Mrs. Wade purchased an annuity from the United Home Life Insurance Company for $89,257.96. On July 1, 1994, she added $26,500 to bring the total amount of the annuity to $115,757.96. Mrs. Wade was listed as the owner of the policy. Charles Grubb was listed as the insured in order to allow the annuity to pay a higher interest rate. The beneficiaries of the annuity were Mrs. Wade's fifteen nieces and nephews as follows: Charles W. Grubb 1/6, Steven A. Grubb 1/6, Michael J. Grubb 1/6, and 1/24 to each of [the] other twelve nieces and nephews. These transactions on June 28, 1994 and July 7, 1994, were the free, informed and voluntary act of Mrs. Wade.

12. On January 17, 1995, shortly after his appointment as Mrs. Wade's attorney in fact, Charles Grubb telephoned United Home Life Insurance Company to find out who the beneficiaries were on Mrs. Wade's annuity. This telephone conversation is memorialized in the United Home Life Insurance Company file. At the time of this telephone conversation, Charles Grubb had no ownership interest in the annuity and no power or right to change the beneficiaries. Within ten days after Charles Grubb's telephone inquiry, the United Home Life policy was changed so that Charles Grubb and his brothers, Michael and Steven, were made contingent owners of the policy. As contingent owners of the annuity, ownership of the annuity would pass to respondents upon the death of Mrs. Wade.

13. At the time of Martha Wade's death, the United Home Life annuity had a value of $96,144.26. (Withdrawals taken by Mrs. Wade during her life account for the difference between the purchase price of the annuity and the value of the annuity at the time of Mrs. Wade's death).

14. On December 29, 1997, while Charles Grubb was Mrs. Wade's attorney in fact and after she had become ill, Mrs. Wade purchased an annuity from the Jackson National Life Insurance Company for $59,000. Charles Grubb arranged the meeting with the salesperson from whom the annuity was purchased. Respondents were made contingent owners of the annuity. As contingent owners of the annuity, ownership of the annuity would pass to respondents upon Mrs. Wade's death.

15. The $59,000 check for the Jackson National Life Insurance annuity bears Mrs. Wade's signature. However, the remainder of the check, including the entries for the payee and dollar amount of the check, was completed by someone other than Mrs. Wade.

16. At the time of Mrs. Wade's death, the Jackson National Life Insurance annuity had a value of $61,685.55.

17. On August 19, 1958, Mrs. Wade purchased a life insurance policy from the United Home Life Insurance Company. Her husband was named the beneficiary of the policy.

18. On March 7, 1994, Mrs. Wade changed the beneficiary on the life insurance policy to her estate.

19. On January 6, 1998, after Mrs. Wade had become ill and after Charles Grubb had been made Mrs. Wade's power of attorney, Mrs. Wade's estate was removed as beneficiary of the policy and replaced by respondents. On March 11, 1998, while Mrs. Wade was ill, Charles, Michael and Steven Grubb were made owners of the policy. Deborah Bowman, the agent who participated in these changes, testified at trial but was unable

to recall the circumstances surrounding these changes.

20. The value of the United Home Life insurance policy at the time of Mrs. Wade's death was $40,076.28.

21. Mrs. Wade died on November 18, 1998. The total value of Mrs. Wade's estate at the time of her death was $48,955.58.

(Appellant's App. pp. 9–13) (internal references to transcript and exhibits omitted).

On March 5, the trial court entered its Order Determining Ownership of Assets, finding that Mrs. Wade's beneficiary changes were presumptively fraudulent because of Charles' fiduciary relationship with Mrs. Wade due to his attorney in fact status, shifting the burden to the Grubbs. The trial court found that the Grubbs failed to meet this shifted burden, and ordered that all of the proceeds from the annuities and the life insurance policy were property of the estate and must be paid over by the Grubbs.

The Grubbs now appeal. Additional facts will be supplied as necessary.

## DISCUSSION AND DECISION

### I. Presumption of Fraud

We address first whether the trial court erred by requiring the Grubbs to rebut, by clear and unequivocal evidence, the presumption that the transactions in question from Mrs. Wade to Charles were fraudulent due to his status as her attorney in fact.

Here, the Grubbs are appealing from a negative judgment, because, in the trial court they were the party bearing the burden of proof and judgment was entered adverse to their position. Therefore, our review of the trial court's determination in the present case is one of limited scope. Additionally, we note that the trial court granted the Grubbs' request for written findings on August 22, 2000. (Appellant's App. p. 7). Thus, the trial court entered requested findings of fact and conclusions of law.

■■■ When we review a trial court's judgment based upon findings of fact and conclusions of law, we will reverse only if the findings and conclusions drawn therefrom are clearly erroneous. *Crider v. Crider*, 635 N.E.2d 204, 210 (Ind.Ct.App. 1994); *Ind. Trial Rule* 52(A)(3). A judgment is clearly erroneous when it is unsupported by the findings and conclusions. *Id.* Findings of fact are clearly erroneous if the record fails to disclose any facts in evidence, or any reasonable inferences from the evidence, in support of the findings. *Donavan v. Ivy Knoll Apts. Partnership*, 537 N.E.2d 47, 50 (Ind.Ct.App. 1989). We will not reweigh the evidence nor assess the credibility of witnesses, and we will affirm the trial court unless the evidence, when viewed in a light most favorable to the judgment, points uncontrovertibly to an opposite conclusion. *Id.* at 50–51.

The Grubbs argue that the trial court improperly held that a presumption of fraud attached to four (4) transactions that took place after Charles was appointed as Mrs. Wade's attorney in fact. Specifically, the Grubbs maintain that Mrs. Wade executed these transactions by herself and on her own accord.

■■■ In Indiana, various legal and domestic relationships raise a presumption of confidence and trust as to the subordinate party on the one hand and a corresponding influence as to the dominant party on the other. *Lucas v. Frazee*, 471 N.E.2d 1163, 1166 (Ind.Ct.App.1984). These relationships include, among others, principal and agent. *Id.* at 1166–1167. Where the relationship is one of principal and agent, if the plaintiff's evidence establishes (a) the existence of a fiduciary relationship, and (b) the questioned transaction between the two (2) parties resulted in an advantage to

the dominant party in whom the subordinate party had reposed both their trust and confidence, "the law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and thus void." *Id.* at 1167. Once these facts are established, the burden shifts to the dominant party in the relationship to rebut the presumption by clear and unequivocal proof. *Id.* Undue influence is defined as "the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." *Crider v. Crider*, 635 N.E.2d 204, 210 (Ind.Ct.App.1994).

In *Villanella v. Godbey*, 632 N.E.2d 786 (Ind.Ct.App.1994), we recognized that a presumption of fraud attaches to transactions entered into during the existence of a fiduciary relationship regardless of whether the fiduciary actually used his fiduciary powers to complete the transactions. In *Villanella*, Boucher executed a power of attorney naming Godbey as her attorney in fact. *Id.* at 788. After executing the power of attorney, Boucher signed two checks totaling more than $48,000.00 payable to Godbey. *Id.* at 788–789. Boucher also executed a handwritten note stating that she gave Godbey the check with full consent as gifts. *Id.* Later, she changed her will to leave the family farm to Godbey. *Id.* Boucher also signed a bank withdrawal slip closing an account containing approximately $30,000.00 in order to transfer it to Godbey's account. *Id.* In this case, the power of attorney in Godbey created a fiduciary relationship between Godbey and Boucher. The fiduciary duty, coupled with the transfer of thousands of dollars in cash and thirty-seven (37) acres of real property for nominal or no consideration, gave rise to a presumption of undue influence and fraudulent transfers. *Id.* at 790.

As in *Villanella*, the fiduciary relationship between Charles and Mrs. Wade, coupled with the transfer of thousands of dollars from annuities, gave rise to a presumption of undue influence and fraudulent transfers. Having determined that a presumption of undue influence arose, we must determine whether the trial court's judgment against the Grubbs was contrary to law and whether the evidence sufficiently sustained the judgment under the clear and unequivocal proof standard. *See Lucas*, 471 N.E.2d at 1167.

In the present case, there are four (4) significant transactions triggering the presumption of undue influence and fraudulent transfers. In each of these transactions, Mrs. Wade changed the beneficiary from her estate to the Grubbs. The record reflects that Mrs. Wade changed the beneficiary under her First Penn Pacific annuity from her estate to the Grubbs on September 7, 1995. This was (9) months after Charles was appointed attorney in fact. Charles did not execute the beneficiary change form as her power of attorney. Mrs. Wade executed the change form herself. However, the record also indicates that Mrs. Wade trusted and depended on the Grubbs and, as a result, she was the subordinate in their relationship.

Additionally, the record shows that on June 28, 1994, Mrs. Wade purchased an annuity from the United Home Life Insurance Company. Mrs. Wade was listed as the owner of this annuity and Charles was listed as the insured on the annuity in order to allow the annuity to pay a higher interest rate. The beneficiaries of the annuity were Mrs. Wade's fifteen (15) nieces and nephews. However, Charles called United Home Life Insurance Company on January 17, 1995, shortly after his appointment as Mrs. Wade's attorney in fact, to find out who the beneficiaries were on the annuity. Within ten (10) days of his phone

call, the United Home Life Insurance Company policy was changed so that Charles and his brothers, Steven and Michael, were made contingent owners of the policy.

The evidence presented at trial also indicates that Charles arranged a meeting at Mrs. Wade's request in order to purchase an annuity from Jackson National Life Insurance Company for $59,000.00. The Grubbs were made the contingent owners of this annuity with ownership of the annuity passing to them upon Mrs. Wade's death. Mrs. Wade signed the $59,000.00 check used to purchase the annuity from Jackson National Life Insurance Company. Dorothy Wade testified that the signature looked "like Mrs. Wade's signature when she was writing good (sic)." (Transcript p. 175). However, Dorothy Wade also testified that the other portions of the check were not Mrs. Wade's handwriting. Someone other than Mrs. Wade completed the remaining portions of the check, including the entries for the payee and the dollar amount of the check.

The evidence also confirms that on January 6, 1998, Mrs. Wade's estate was removed as the beneficiary of a United Home Life Insurance Company policy and replaced by the Grubbs. Eventually, on March 11, 1998, the Grubbs were named the owners of this policy.

■ With the above in mind, it is beyond dispute that the evidence in this case sufficiently establishes (a) the existence of a fiduciary relationship between Charles and Mrs. Wade, and (b) the questioned transactions between Charles and Mrs. Wade resulted in an advantage to Charles, the dominant party in the relationship. *Lucas*, 471 N.E.2d at 1167. "The law presumes fraud when a person with a fiduciary duty benefits from a questioned transaction." *Clarkson v. Whitaker*, 657 N.E.2d 139, 144 (Ind.Ct.App.1995). Therefore, the burden of proof fell upon the Grubbs to

prove the validity of the transactions by clear and unequivocal proof. The Grubbs, however, failed to present evidence from which the trial court could reasonably conclude that Charles rebutted, by clear and convincing evidence, the presumption of undue influence, and failed to disprove the allegations of fraud raised by Eads. *See Lucas*, 471 N.E.2d at 1167. Accordingly, the undisputed evidence creates the presumption that the transactions were the result of undue influence, constructively fraudulent, and, therefore, void. *Id.*

## II. Effects of Fraudulent Transactions on a Fiduciary's Family Members

■ Next, we address whether the trial court erred by determining that a fiduciary's family member may not retain the benefits of fraudulent transactions. Specifically, Steven and Michael argue that even if the trial court was correct in finding that the transactions benefiting Charles were presumptively fraudulent, they should be allowed to benefit from the transactions because, unlike Charles, they were not in a fiduciary relationship with Mrs. Wade.

■ The rule is that transactions entered into during the existence of a fiduciary relationship are presumptively invalid as the product of undue influence. *Matter of Good*, 632 N.E.2d 719, 721 (Ind.1994). Here, the Grubbs contend that only a portion of the transactions are presumptively invalid, that being Charles' portion, due to his status as Mrs. Wade's attorney in fact. The evidence, however, is insufficient to rebut the presumption of undue influence. *See Lucas*, 471 N.E.2d at 1167. Because the Grubbs have failed to rebut by clear and unequivocal evidence the presumption that the transactions that occurred while Charles was in a fiduciary relationship with Mrs. Wade were constructively fraudulent, it is our determination that the transactions are void in their entirety.

To adopt the Grubbs' reasoning here would allow a fiduciary to escape the presumption of fraud by funneling the benefits of such transactions to his family members. Indiana courts have recognized this danger over the years. In fact, we have held that a will is presumed to be void because of fraud or undue influence if it provides a bequest to the attorney who drafted it or one of his family members. *Clarkson,* 657 N.E.2d at 144.

## CONCLUSION

Based on the foregoing, we conclude that a presumption of fraud attaches to transactions that benefit a fiduciary. We also conclude that the family members of a fiduciary cannot retain the benefits of fraudulent transactions. Therefore, we conclude that the trial court's Order Determining Ownership of Assets was proper.

Affirmed.

MATTINGLY–MAY, J., and VAIDIK, J., concur.