James NICHOLS, Appellant–
Respondent,

v.

ESTATE OF TYLER, Appellee–
Petitioner.

No. 45A04–0811–CV–640.

Court of Appeals of Indiana.

July 28, 2009.

David E. Braatz, Crown Point, IN, Attorney for Appellant.

Richard M. Davis, Kevin G. Kerr, Hoeppner Wagner & Evans, LLP, Valparaiso, IN, Attorneys for Appellee.

## OPINION

BROWN, Judge.

James Nichols appeals a judgment in favor of Maureen Utley, personal representative of the Estate of Ernest M. Tyler. Nichols raises two issues, which we revise and restate as:

I.  Whether the trial court erred when it concluded that Ernest Tyler was incompetent on February 8, 2005 to convey real property; and

II. Whether the trial court erred by determining that Nichols failed to rebut the presumption of undue influence over Ernest Tyler with regard to a real property transfer.

We affirm.

The facts most favorable to the judgment follow. Seventy-eight year old Ernest Tyler had dealt with mental health issues throughout his life. Tyler spent April 21, 1954 until July 16, 1955 at Beatty Memorial Hospital after shooting at his brother and then turning the gun on the police. While committed to Beatty Memorial Hospital, Tyler was diagnosed with

chronic brain syndrome and epilepsy. He was recommitted on October 1, 1958. Tyler was admitted to Our Lady of Mercy Hospital from June 6 until June 29, 1984 for treatment of manic depressive illness. In September 2005, Tyler was taken by his family to St. Anthony Medical Center where doctors determined that he exhibited a "clear departure from his baseline mental status." Ex. Vol. I, Petitioner's Ex. 8. The doctors discovered that Tyler had not been taking his prescription medications for schizophrenia and epilepsy for an unknown period of time.

Tyler could always answer simple questions, but he "never carried on a conversation." Transcript at 75. Tyler's grandniece, Susanna Isaacs, explained that Tyler "never really formed a thought. And so, we ... just accepted that as to who [Tyler] was and we dealt with it." *Id.* Tyler's niece, Maureen Utley, testified when asked whether she had ever had an in-depth conversation with Tyler that "[Tyler] wasn't capable of it." *Id.* at 94.

In 1988, Tyler's brother, Charles, who had shared the farm with Tyler and who had supported Tyler for decades, died. After Charles's death, Tyler's primary caretaker was his sister Allegra, who drove Tyler to get groceries and for other errands. Allegra stopped assisting Tyler in 2003 when she entered a nursing home. However, before she entered the nursing home, Allegra spoke with Nichols, Tyler's neighbor of many years and family friend, about assuming those responsibilities. The Tylers had in the past cared for Nichols's grandmother, and they "figured it was payback time." *Id.* at 31–32. Nichols and his family thereafter provided support.

In 2001, Tyler lost approximately $10,000 as the result of a check fraud scam. Tyler asked Nichols to help him deal with the bank on the issue. Nichols took Tyler to see Patrick Shuster, an attorney with whom Nichols had dealt on previous occasions. In October 2001, Tyler signed a Durable Power of Attorney agreement which appointed Nichols as Tyler's Attorney in Fact, enabling Nichols to act directly on Tyler's behalf in dealing with the bank. Tyler's estate plan was also discussed. Nichols never contacted anyone in Tyler's family about the check fraud scam or the fact that he was Tyler's Attorney in Fact.

In March 2002, with the assistance of Shuster, Tyler formed a revocable living trust and transferred to the trust the real estate, including a 124 acre farm and a farmhouse valued together at about $1.5 million, which he had inherited from his mother. Nichols was the trustee of the trust and Tyler was the sole beneficiary. On February 8, 2005, Tyler signed a Direction to Sign Contract for Conditional Sale of Real Estate (the "Contract"), directing Nichols as trustee to sell his real estate held in trust to Nichols. Nichols took the property by another trust which he formed. Under the terms of the Contract, Tyler retained a life estate in the property, and Nichols was required to pay Tyler $200 per month until Tyler's death. Nichols was also responsible for paying all taxes, assessments, and insurance with respect to the property. Throughout the dealings between Tyler, Nichols, and Shuster, Shuster was never made aware of Tyler's mental health history.

In July of 2005, Ruth Utley, one of Tyler's sisters, and her husband Howard went to visit Allegra in the nursing home, and Allegra told Ruth that Nichols had stopped in and told Allegra that Tyler had "fell and hurt his head." *Id.* at 34. Ruth tried to reach Tyler by phone for a few days, and then on July 17, 2005 she called Nichols. Nichols told Ruth that Tyler was "okay," but Ruth was not "entirely at ease with the conversation" and decided to visit

Tyler herself. *Id.* at 34–35. Later that day, Ruth and Howard drove to visit Tyler, but when they arrived at Tyler's house, Tyler did not come to the door. Howard went to Nichols's residence for assistance and learned that Nichols had left with the only key to Tyler's house and was four hours away. Ruth and her family were worried "that [Tyler] might have been dead because it was ninety-five degree weather and [the] house was locked up tight." *Id.* at 36. There were no windows open, and the house did not have air conditioning. Right outside the front steps, there was a stack of used adult diapers, as well as a diaper "laying over the rail and it was quite an odor." *Id.* at 37.

Ruth and Howard returned home and they called the Sheriff for help. They met the Sheriff at Tyler's home, and the Sheriff called Nichols and told him that he had to return with the key. Nichols returned around ten p.m. Ruth finally saw and spoke with Tyler, who appeared happy to see her. The Sheriff noted in his incident report that:

> The home was not good living conditions [sic]. The home had no air condition[ing] and was very hot and humid inside. The home smelled of urine and mildew. There was trash on the floors and some parts of the home I could not gain access [to] due to the amount of trash on the floors. . . . [Tyler] appears to be fine but giving [sic] the living conditions and his age [Tyler] needs to be under constant supervision.

Appellee's Appendix at 29.

Tyler was "filthy." Transcript at 70. He had dirt in his fingernails, as well as an eye infection, scaly skin that looked like he had eczema, and his ears were "oozing out . . . pus." *Id.* at 70–71. Ruth first learned that day that Nichols had a Durable Power of Attorney to act on behalf of Tyler.

Ruth and Howard returned to Tyler's home on July 22, 2005, accompanied by Isaacs and Isaacs's husband, as well as Isaacs's aunt, Joyce. Again, Tyler did not answer the door, and Nichols refused to let them see Tyler. Isaacs then called the police for help. Once the Police Officer gained entry to the home he asked Tyler if he would like to speak to his family, and Tyler said yes. Nichols allowed Tyler's family to speak with Tyler for five minutes. Tyler asked his family if he could go with them, and Tyler told them that "they won't let me out of the house, I can't even get my mail anymore." *Id.* at 69. After the five minutes were up, Nichols told the family that they had to leave. Nichols also reminded Tyler that the family members were the ones that were trying to "put him away, and die or something." *Id.* at 69–70. The Police Officer advised the family to seek guardianship should they want to have better access to Tyler.

On August 2, 2005, pursuant to the family's attempt to obtain guardianship, Tyler was taken by his family to see Dr. Bernardo Lucena. Dr. Lucena administered a "Mini Mental Examination" and determined that Tyler was both mentally and physically incapacititated by Alzheimer's Disease. Dr. Lucena opined that, based on Tyler's condition, Tyler had been incapacitated for about one year. Dr. Lucena acknowledged, however, that it was not possible to know for certain whether Tyler's mental incapacitation, which he observed in August, was present in February when Tyler signed the document directing Nichols to sell his real estate, and that his determination was based upon Tyler's mental history and the examination he administered.

The family continued to visit Tyler. Despite the fact that a judge told Nichols to produce a key to Tyler's home, he never did so; consequently, the family was

forced to make arrangements with Nichols every time they wanted to visit Tyler. Nichols also prevented the family from having direct contact with Tyler by having Tyler's telephone line ring directly to Nichols's house. During the family's visits, Nichols or one of the members of his family videotaped the interactions between Tyler and Tyler's family. Maureen testified that on one such occasion she heard Nichols tell Tyler that "you don't want them to put you back in Westville. [Nichols] said that's what [the family] want[s] to do.... We did not want to put him there, of course not." *Id.* at 99.

On September 11, 2005, Isaacs, Ruth, and Howard again visited Tyler. When they arrived at the farm, Tyler was sitting in a golf cart and he was "moving his hands and screaming." *Id.* at 73. Tyler told Isaacs "[Nichols is] hiding out there and [he is] still trying to steal my farm." *Id.* at 74. Isaacs and Maureen soon after obtained guardianship over Tyler. Tyler died on January 6, 2006, six days short of his seventy-ninth birthday.

Trial proceedings challenging the Contract of Sale to Nichols commenced on June 19, 2008. In addition to witness testimony heard at trial, the Estate admitted videotape evidence filmed by Nichols or a member of Nichols's family in July of 2005. The tape was entered "to give [the trial court] a chance ... to just visualize [Tyler] and his reactions ..." *Id.* at 272. On October 2, 2008, the trial court entered its findings of fact and conclusions of law. The trial court found that: (A) Tyler was incompetent at all relevant times; (B) Tyler "had an extensive history of mental illness, consisting of schizophrenia, schizoaffective, bi-polar disorders;" (C) Dr. Lucena, who was the only expert witness who actually physically examined Tyler, testified that Tyler was incompetent at the time he entered into the agreements at

issue; (D) Nichols was not a credible witness; (E) Nichols used his position to exert undue influence over Tyler, "who lacked the mental capacity to understand the nature and value of his worth"; (F) Nichols accomplished this by keeping Tyler from seeing his family; and (G) Nichols's undue influence resulted in Tyler deeding his real property into a trust, "and subsequently having Mr. Tyler execute documents as beneficiary of the trust, directing [Nichols] to enter into a conditional sales contract authorizing the trust to sell [Nichols] this valuable real property that had been farmed by Mr. Tyler's entire family and left to Mr. Tyler and his predeceased brother by their parents[,] for the sum of $200.00 per month for the remainder of Mr. Tyler's life...." Appellant's Appendix at 9–10. The trial court concluded that the trust formed in 2002 and "subsequent Direction to Sign Contract and the Contract for Conditional Sale of Real Estate executed on February 8, 2005 are null and void and that title to the real estate ... is hereby vested in fee simple in the Estate of Ernest m[sic] Tyler." *Id.* at 10.

In reviewing a trial court's judgment based upon findings of fact and conclusions of law, "we will reverse only if the findings and conclusions drawn therefrom are clearly erroneous." *In re Estate of Wade,* 768 N.E.2d 957, 961 (Ind.Ct.App. 2002), *trans. denied.* A judgment is clearly erroneous when the findings and conclusions do not support it. *Id.* "Findings of fact are clearly erroneous if the record fails to disclose any facts in evidence, or any reasonable inferences from the evidence, in support of the findings." *Id.* We cannot reweigh the evidence nor assess the credibility of witnesses, and we will affirm the trial court unless the evidence, when viewed in a light most favorable to the judgment, "points uncontrovertibly to an opposite conclusion." *Id.*

## I.

██ The first issue is whether the trial court erred by concluding that Tyler was mentally incompetent to sign the Contract on February 8, 2005. Indiana law "allows competent adults the utmost liberty in entering into contracts that, when entered into freely and voluntarily, will be enforced by the courts." *Zollman v. Geneva Leasing Associates, Inc.*, 780 N.E.2d 387, 392 (Ind.Ct.App.2002); *see also Trotter v. Nelson*, 684 N.E.2d 1150, 1152 (Ind. 1997) ("We recognize a very strong presumption of enforceability of contracts that represent the freely bargained agreement of the parties." (internal quotations omitted)), *abrogated on other grounds by Liggett v. Young*, 877 N.E.2d 178 (Ind.2007).

██ The mental capacity required to enter into a contract "is whether the person was able to understand in a reasonable manner the nature and effect of his act" on the date of the agreement. *Wilcox Mfg. Group, Inc. v. Mktg. Servs. of Ind., Inc.*, 832 N.E.2d 559, 562, 563 (Ind.Ct.App. 2005). Evaluating mental capacity to contract for the sale of real property is closely akin to evaluating the mental capacity necessary to make a will. *Hunter v. Milhous*, 159 Ind.App. 105, 125 n. 4, 305 N.E.2d 448, 460 n. 4 (1973), *reh'g denied*. "In will contests, evidence as to the testator's mental condition both prior and subsequent to the execution of the will is admissible." *Id.* "[P]roof of unsoundness of mind of a permanent nature raises an inference that such condition continues until the contrary is shown...." *Farner v. Farner*, 480 N.E.2d 251, 259 (Ind.Ct.App.1985).

Nichols argues that Dr. Lucena's deposition testimony does not support the trial court's finding that Dr. Lucena found Tyler to be incompetent on February 8, 2005, when Tyler agreed to the Contract, and that the facts do not support the trial court's judgment that Tyler was incompetent on February 8, 2005. First, with regard to Dr. Lucena's deposition, Nichols argues that Dr. Lucena's statements regarding Tyler's affliction with Alzheimer's Disease, and Tyler's prior mental history, constitute "a 'statement contained in the record' [rather than] a 'fact or inference supported by the record.'" Appellant's Brief at 17. Nichols contends that Dr. Lucena contradicted himself on cross-examination by testifying that, because he did not examine Tyler before February 8, 2005, it was technically possible that Tyler was competent at that time.

This argument is without merit. Dr. Lucena gave expert witness testimony and rendered his expert opinion on Tyler's mental capacity. Dr. Lucena relied on his own physical examination plus Tyler's mental history. On redirect examination, Dr. Lucena testified that his opinion that Tyler was incompetent when the Contract was signed was to "a reasonable degree of medical certainty." The trial court found that Dr. Lucena's expert opinion was sound, and it entered the opinion as a finding of fact. Nichols simply requests that we reweigh the evidence, which we cannot do. *Wade*, 768 N.E.2d at 961.

Second, Nichols argues that the findings of fact do not support the judgment that Tyler was incompetent to sign the Contract on February 8, 2005.[1] Here, the

---

1. Specifically, Nichols argues: "Competency is not a static condition." Appellant's Brief at 18 (quoting *Timberlake v. State*, 753 N.E.2d 591, 598 (Ind.Ct.App.2001), *reh'g denied, cert. denied* 537 U.S. 839, 123 S.Ct. 162, 154 L.Ed.2d 61 (2002)). Nichols makes his argument by analogizing to the standards for competency to stand trial in a criminal case. *Id.* Nichols also argues that Attorney Shuster's belief that Tyler was competent to contract, which was not rebutted by the Estate, compounds the lack of factual support for the trial court's conclusion.

record reveals that Dr. Lucena testified to a reasonable degree of certainty that Nichols was incompetent at the time he signed the Contract. The trial court's order also cited Tyler's "extensive history of mental illness, consisting of schizophrenia, schizoaffective, [and] bi-polar disorders" as reasons in finding Tyler "at all times relevant hereto [ ] not competent." Appellant's Appendix at 9.

The record also reveals that extensive evidence of Tyler's lack of mental capacity was presented. Tyler was diagnosed by Dr. Lucena with Alzheimer's Disease. Tyler had been committed to a mental institution on three separate occasions. One of the involuntary commitments was brought about by Tyler shooting a gun at Tyler's brother and subsequently turning the gun on the police. Tyler was not known to carry on in-depth conversations, and "never really formed a thought." Transcript at 75. Tyler's living conditions were poor; his home smelled of urine and mildew, he had a pile of used adult diapers at the front door, and there was so much trash inside the home that it prevented the Sheriff from gaining access to parts of the house. The evidence also shows that Tyler exhibited poor personal hygiene, including an eye infection, scaly skin, dirt in his fingernails, and ears that were "oozing" pus. Transcript at 70–71.

Finally, we do not find compelling the fact that Attorney Shuster deemed Tyler competent to contract. Shuster was not an expert in mental competency. Shuster was not aware of Tyler's history of mental health issues. More importantly, the trial court did not rely on Shuster's testimony in rendering its findings of fact and conclusions of law, and to attach dispositive weight to that testimony on appeal would be to reweigh the evidence, which we cannot do. *Wade*, 768 N.E.2d at 961.

We conclude that the trial court's judgment that Tyler was incompetent to sign the Contract on February 8, 2005 was not clearly erroneous. *See In re Haas' Will*, 115 Ind.App. 1, 54 N.E.2d 119 (1944) (holding that evidence of the decedent's conduct was sufficient to find that she was of unsound mind to contract).

## II.

■ The next issue is whether the trial court erred in determining that Nichols failed to rebut the presumption of undue influence over Ernest Tyler with regard to a real property transfer. "Undue influence is defined as 'the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised.' " *Gast v. Hall*, 858 N.E.2d 154, 166 (Ind.Ct.App. 2006) (quoting *Wade*, 768 N.E.2d at 962), *reh'g denied, trans. denied*. Undue influ-

While true that mental capacity on the date of the agreement is the relevant inquiry, the standard for determining competency to stand trial is not the correct standard to apply. In judging competency to stand trial, the trial court inquires as to whether a criminal defendant is competent at the time of trial to assist in his own defense. *Wallace v. State*, 486 N.E.2d 445, 453 (Ind.1985), *reh'g denied, cert. denied* 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 723 (1986). As stated above, however, the standard to be used here is more closely akin to that in making a will, and therefore evidence as to one's mental condition prior and subsequent to the date of signing is both admissible and relevant. *Hunter*, 159 Ind.App. at 125 n. 4, 305 N.E.2d at 460 n. 4. While competency determinations to stand trial are always made by the trial court based on a criminal defendant's *present* mental state at the time of trial, incompetency to contract on the date of the agreement must usually be inferred from extrajudicial evidence. The relevant inquiries made by the trial court are therefore wholly inapposite.

ence may be proven by circumstantial evidence; the "only positive and direct proof required is of facts and circumstances from which undue influence may be reasonably inferred." *Id.* Courts may also take into account the fact that the subordinate party suffers from "great mental weakness" in its determination that undue influence contributed to the transaction. *Isenhour v. Speece,* 238 Ind. 293, 299–300, 150 N.E.2d 749, 752–753 (1958) (citing *Allore v. Jewell,* 94 U.S. (4 Otto) 506, 511, 24 L.Ed. 260 (1877)). Complete unsoundness of mind is not necessary to support a finding of undue influence; rather, weakness of mind when combined with other factors is sufficient. *Hunter,* 159 Ind.App. at 125 n. 4, 305 N.E.2d at 460 n. 4. In judging whether or not undue influence existed, "it is proper to consider the character of the proponents and beneficiaries, and interest or motive on their part to unduly influence the [other party], and facts and surroundings giving them an opportunity to exercise such influence." *Gast,* 858 N.E.2d at 166 (quoting *Davis v. Babb,* 190 Ind. 173, 182, 125 N.E. 403, 406 (1919)).

In Indiana, certain legal and domestic relationships "raise a presumption of trust or confidence as to the subordinate on the one hand, and a corresponding influence as to the dominant party on the other." *Hamilton v. Hamilton,* 858 N.E.2d 1032, 1036 (Ind.Ct.App.2006), *trans. denied.* When transactions occur between a dominant and a subordinate party which benefit the dominant party, "the law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and, thus void." *Id.* To rebut the presumption of undue influence, a dominant party has to demonstrate to the trial court by clear and unequivocal proof that the transaction in question was made at arm's length and is therefore valid. *Id.*

Nichols does not dispute the fact that as Tyler's Attorney in Fact, he owed Tyler a fiduciary duty, and that therefore, under Indiana law, a presumption of undue influence as to the property transfer in 2005 arose. Nichols argues that "there is no evidence in the Record that Nichols had Tyler enter into any trust agreement, conditional sales contract, or any other document whatsoever," and also that the evidence presented at trial was insufficient to find that Tyler's mental capacity on February 8, 2005 was deficient. Appellant's Brief at 24. Both arguments essentially ask us to reweigh the evidence, which we cannot do. *Wade,* 768 N.E.2d at 961.

With regard to Nichols's first argument, we remind Nichols that positive proof of undue influence is not required; undue influence may be proven by circumstantial evidence. *Gast,* 858 N.E.2d at 166. Here, the record reveals that Nichols received a parcel of land worth approximately $1.5 million, and in exchange Nichols agreed to pay Tyler $200.00 per month for the rest of Tyler's life, a wholly unfair and one-sided transaction. Nichols had unfettered access to Tyler for at least four years. Nichols introduced Tyler to Shuster, an attorney whose services Nichols had retained on a previous occasion. Nichols drove Tyler to see Shuster on February 8, 2005, the day on which Tyler signed the Contract. Also, Nichols did not disclose to Tyler's family any of the legal dealings entered into between Nichols and Tyler. Nichols also attempted to keep Tyler from seeing or speaking with his family, including leaving town with the only key to Tyler's residence, handling Tyler's mail, and having Tyler's phone line ring directly to Nichols's house. When Tyler's family did get a chance to speak to Tyler, Nichols was always present, and Nichols repeated-

ly told Tyler that his family was attempting to have Tyler committed. Thus, there was enough evidence for the trial court to find that Nichols unduly influenced Tyler into selling his property to Nichols for inadequate consideration.

Second, Nichols argues that the evidence did not support the finding that Tyler was incompetent. We have already determined that the trial court did not err by finding that Tyler was incompetent. *See* Part I. Thus, Nichols failed to rebut the presumption of undue influence by clear and unequivocal proof with regard to this factor. Although mental weakness or incapacity is not necessary to demonstrate that a contract was the product of undue influence, its presence contributed to Nichols's failure to rebut the presumption by clear and unequivocal proof. *See Isenhour,* 238 Ind. at 297, 302, 150 N.E.2d at 751, 753 (holding that evidence including a person's advanced age, his lack of good personal hygiene, and his "filthy" home were relevant to finding that a real estate transfer was the product of undue influence).

The trial court determined that Nichols was not a credible witness. Nichols did not defeat the presumption that the transaction was the product of undue influence by clear and unequivocal proof. Specifically, Nichols failed to demonstrate that he did not take advantage of the opportunity to exercise heavy and undue influence on Tyler, an elderly man not his relative, and who had a history of mental infirmity, between 2001 and 2005. Unlike in *Meyer v. Wright,* relied upon by Nichols, Nichols never had Tyler examined by a doctor who might have provided independent judgment as to Tyler's ability to enter into an arm's length transaction. 854 N.E.2d 57, 61 (Ind.Ct.App.2006), *trans. denied.* Nichols instead relied entirely on a determination made by an attorney who was not a medical expert and who was never made aware of, nor inquired into, Tyler's mental health history.[2]

Though couched differently, Nichols's arguments are little more than an invitation for this Court to reweigh the evidence presented at trial, which we cannot do. *Wade,* 768 N.E.2d at 961. At trial, two very different images of Ernest Tyler were depicted by the parties, and the trial court found that the depiction presented by Tyler's Estate was the more accurate one. We cannot say that the trial court erred by determining that Nichols failed to rebut the presumption of undue influence. *See Crider v. Crider,* 635 N.E.2d 204, 213 (Ind. Ct.App.1994) (holding that the facts presented amply supported the trial court's findings of fact and conclusions of law in finding undue influence, and that appellant's arguments were simply invitations to reweigh the evidence), *trans. denied.*

---

**2.** In his brief, Nichols also relies on *Hudson v. Davis,* 797 N.E.2d 277 (Ind.Ct.App.2003), *reh'g denied, trans. denied,* and *Outlaw v. Danks,* 832 N.E.2d 1108 (Ind.Ct.App.2005). *trans. denied.* Both cases are distinguishable, however. First, in *Hudson* we reversed the trial court's grant of summary judgment in voiding the contract at issue. We held that although Hudson's burden of rebutting the presumption of undue influence was "considerable," "[s]ummary judgment ... should not be used as an abbreviated trial, even where the proof is difficult or where the court may believe that the non-moving party will not succeed at trial." *Hudson,* 797 N.E.2d at 287.

In *Outlaw,* the issue concerned a blind decedent's signing of a second will three months before she died. The trial court in *Outlaw,* however, found "ample evidence that it was [the decedent's] intent to leave her property to [the defendant]," including that the decedent told the plaintiff's brother "that she wanted to leave her property to [the brother and the defendant]." *Outlaw,* 832 N.E.2d at 1111. Also, there was no evidence of mental infirmity; rather, the issue concerned the decedent's blindness. *Id.*

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

CRONE, J., and BRADFORD, J., concur.