


FILED

Mar 27 2024, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Wade A. Hummer and Lindsay A. Hummer,

*Appellant-Plaintiffs*

v.

Allen D. Donathan, Carolyn S. Beckley, and Mary H. Thornburgh,

*Appellee-Defendants*

---

March 27, 2024

Court of Appeals Case No.
23A-MI-1925

Appeal from the Blackford Circuit Court

The Honorable Brian W. Bade, Judge

Trial Court Cause No.
05C01-2008-MI-000141

---

**Opinion by Judge Felix**
Chief Judge Altice and Judge Bradford concur.

**Felix, Judge.**

## Statement of the Case

Norma Donathan died testate in 2020 and was survived by her four children. Norma's will, which she executed in 2016 and amended by codicil in 2018, disinherited one of her children—Kathy Hummer. After Norma's death, Kathy sued her three siblings, contesting Norma's will. However, Kathy died in 2021, so her children Wade and Lyndsay Hummer (collectively, the "Hummers") were substituted as plaintiffs in the will contest. Kathy's siblings subsequently filed a motion for summary judgment on all the Hummers' claims, which the trial court ultimately granted. The Hummers now appeal and raise two issues for our review that we revise and restate as the following single issue: Whether the trial court erred in granting summary judgment in favor of Kathy's siblings.

We affirm.

## Facts and Procedural History

Norma and Fred Donathan had four children: Kathy, Allen Dewayne Donathan ("Wayne"), Carolyn Beckley, and Mary Thornburgh. Beginning in approximately 2012, Wayne, Carolyn, and Mary "put [their] lives on hold for the care of [their] parents." Appellants' App. Vol. II at 65, 69, 73. On March 23, 2014, Fred died while in assisted living at Albany Health & Rehabilitation Center ("Albany Health"). In September 2014, Norma suffered a stroke. By January 2016, Norma had been diagnosed with Parkinson's disease. On January 5, 2016, Norma was admitted to IU Health Ball Memorial Hospital

("Ball Hospital") with complaints of "generalized weakness and not feeling well." Appellants' App. Vol. II at 160. The nurse practitioner who examined Norma for 60 minutes upon her arrival at Ball Hospital noted Norma was "awake, alert, and oriented to person, place, time, and situation." *Id.* at 162. Four days later, a physical exam again revealed that Norma was "alert and oriented," and she was discharged from Ball Hospital. *Id.* at 165. Following her hospitalization, Norma spent approximately five weeks at Albany Health for rehabilitation. Norma's Albany Health progress notes from January 10, 11, and 12, 2016, all indicated that Norma was "alert and oriented." *Id.* at 170. Additionally, the progress note from January 10 stated that Norma was "able to recall some staff names from when [her] husband was here." *Id.*

[4] Sometime in late 2015 or early 2016, Wayne contacted attorney James Forcum about revising Norma's estate plan "so that Kathy . . . would receive nothing from [Norma's] estate." Appellants' App. Vol. II at 179. Forcum had previously revised Norma's estate plan in 2013. On January 13, 2016, Forcum and his longtime legal assistant Elizabeth Thomas visited Norma at Albany Health. When Forcum and Thomas arrived, Wayne and Carolyn were with Norma; Forcum requested Wayne and Carolyn leave Norma's room, and they did. Forcum then proceeded to have a closed-door conversation with Norma about her estate plan, for which Thomas was also present. During this conversation, Forcum examined Norma as to her estate planning goals, the assets to be included in her estate plan, her desired beneficiaries, her "competency to understand her estate plan, and that she was "voluntarily

executing the documents and not under any sort of duress or compulsion to do so." *Id.* at 178–79, 182–83. Forcum also explained the effect of Norma's estate plan to her and confirmed that she intended to execute her will. Forcum determined that "Norma knew where she was, who she was, and exactly what she was doing." *Id.* at 179, 183. Norma "confirmed her intent that Kathy receive nothing from estate," explaining that Wayne, Carolyn, and Mary "all had taken care of her for several years and that it was not fair to them that Kathy did nothing to help and did not even call or come to visit her." *Id.* at 179–80, 183. Further, Norma told Forcum and Thomas that "she loved Kathy, but changing her will was what needed to be done." *Id.* at 183.

[5] Once Forcum was satisfied that "Norma was competent, understood what she was doing, and was doing so voluntarily," Norma, Thomas, and Forcum executed Norma's last will and testament. Appellants' App. Vol. II at 180, 183. The will was three pages in length, and Norma signed all three pages. Norma's will appointed Wayne, Carolyn, and Mary as the personal representatives of her estate. The will further provided, "It is my intention that my daughter, KATHY A. HUMMER, shall receive nothing from my estate." *Id.* at 173. On the third page of Norma's will, Norma, Forcum, and Thomas all declared under the penalties for perjury that, among other things, Norma "executed the Will as her free and voluntary act" and Norma "was of sound mind." *Id.* at 174. Wayne and Carolyn did not reenter Norma's room until after this process was complete.

[6] Following her discharge from Albany Health in February 2016 until the time of her death in 2020, Wayne, Carolyn, and Mary provided around-the-clock care for Norma at Norma's home. Wayne took care of Norma in the morning, Carolyn took care of Norma in the afternoon, and Mary took care of Norma in the evenings. Wayne paid bills, grocery shopped, and transported Norma to appointments; Carolyn acted as Norma's beautician; and both Carolyn and Mary did laundry, cleaned, and dispensed medication for Norma. Wayne gave up two jobs to help care for Norma, and Carolyn retired early to do the same. From 2012 forward, the only time Wayne did not help care for Norma was for a three-month period in 2018 when he was battling cancer; during that time, Carolyn and Mary cared for Norma without assistance from Kathy.

[7] Sometime after Norma executed her will, Wayne contacted Forcum again about revising Norma's estate plan, this time to add Wayne's wife as a beneficiary should Wayne predecease Norma. On January 31, 2018, Wayne took Norma to Forcum's office. Forcum again examined Norma as described above. "Norma knew where she was, who she was, and exactly what she was doing." Appellants' App. Vol. II at 180, 184. Norma "confirmed her intent to leave Wayne's share to [his wife] in the event Wayne predeceased her" because Wayne's wife "had spent considerable time and effort taking care of [Norma]." *Id.* at 180, 184. Norma also "confirmed . . . that Kathy shall still receive nothing from her estate." *Id.* at 180, 184. "After it was clear Norma was competent, understood what she was doing, and was doing so voluntarily," Norma, Thomas, and Forcum executed the codicil. *Id.* at 180, 184. On the

final page of Norma's codicil, Norma, Forcum, and Thomas again declared under the penalties for perjury that, among other things, Norma "executed the Will as her free and voluntary act" and Norma "was of sound mind." *Id.* at 176.

[8] On June 14, 2020, Norma died. Two days later, Norma's will and codicil were admitted to probate. On August 3, 2020, Kathy sued Wayne, Carolyn, and Mary (collectively, the "Personal Representatives"), alleging that Norma's will and codicil were invalid for two reasons: (1) "the unsoundness of mind of the testator" and (2) they were "executed under duress or . . . obtained by fraud." Appellants' App. Vol. II at 26.

[9] On December 14, 2020, the Personal Representatives deposed Kathy. After reviewing the reports from Norma's 2016 stays at Ball Hospital and Albany Health, Kathy testified that she had no reason to believe those reports were inaccurate or reflected anything other than what the medical professionals observed. Likewise, Kathy did not believe Forcum and Thomas committed perjury when they executed Norma's will. On August 2, 2021, Kathy died. Subsequently, the Hummers filed a motion to be substituted as plaintiffs in the will contest, which the trial court granted.

[10] On February 2, 2022, the Personal Representatives filed a motion for summary judgment as to all claims in the Hummers' complaint pursuant to Trial Rule 56. Simultaneously with their motion, the Personal Representatives also filed a brief and designation of evidence in support thereof. The designated evidence

included portions of Kathy's deposition and excerpts of affidavits from the Personal Representatives, Forcum, and Thomas.

[11] The Hummers' original deadline to respond to the motion was March 4, 2022, but the trial court granted the Hummers' motion for an extension of time, pushing their deadline to respond to April 4, 2022. However, the Hummers never filed anything in response to the summary judgment motion on or before April 4, 2022. Instead, on April 11, 2022, the Hummers filed motions requesting an extension of time to respond to the motion and to reschedule the April 16, 2022, hearing on said motion. The Personal Representatives did not object to continuing the hearing but did object to the Hummers receiving more time to respond to their summary judgment motion. On May 16, 2022, the trial court set the matter for a telephonic hearing, which was held on May 19, 2022. The trial court never entered an order either granting or denying the Hummers' motions, but the summary judgment hearing was reset for June 30, 2022. Thereafter, on May 22, 2022, the Hummers filed their response to the Personal Representatives' motion for summary judgment.

[12] On July 27, 2023, the trial court granted summary judgment in favor of the Personal Representatives. This appeal ensued.

## Discussion and Decision

### The Trial Court Did Not Err by Granting Summary Judgment in Favor of the Personal Representatives

[13] As the Indiana Supreme Court has explained, we review summary judgment decisions de novo, which means we apply the same standard as the trial court. *Miller v. Patel*, 212 N.E.3d 639, 644 (Ind. 2023) (quoting *624 Broadway, LLC v. Gary Hous. Auth.*, 193 N.E.3d 381, 384 (Ind. 2022)). Summary judgment is proper only "if the *designated evidentiary matter* shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C) (emphasis added). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *City of Marion v. London Witte Grp., LLC*, 169 N.E.3d 382, 390 (Ind. 2021) (quoting *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009)).

[14] We consider only those portions of the pleadings, depositions, and any other matters specifically designated to the trial court by the parties for purposes of the summary judgment motion. T.R. 56(C), (H). That is, a party may not designate such matters in their entirety but instead must specify which parts thereof on which it relies to support or oppose the motion. *See id.*; *Filip v. Block*, 879 N.E.2d 1076, 1081 (Ind. 2008). We resolve "all factual inferences and all doubts as to the existence of a material issue" in favor of the nonmovant. *Zaragoza v. Wexford of Ind., LLC*, 225 N.E.3d 146, 151 (Ind. 2024) (internal

quotation marks omitted) (quoting *Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012)). In so doing, "we give careful scrutiny to make sure the non-movant's day in court is not improperly denied." *Id.* (internal quotation marks omitted) (quoting *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016)).

[15] The party moving for summary judgment bears the burden of making a prima facie showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Wireman v. LaPorte Hosp. Co.*, 205 N.E.3d 1041, 1045 (Ind. Ct. App. 2023) (citing *Serbon v. City of E. Chicago*, 194 N.E.3d 84, 91 (Ind. Ct. App. 2022)), *reh'g denied* (Apr. 5, 2023), *trans. denied*, 211 N.E.3d 1007 (Ind. 2023). Only if the moving party meets this prima facie burden does the burden then shift to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* (citing *Serbon*, 194 N.E.3d at 91).

[16] As a preliminary matter, the Personal Representatives claim that we cannot consider the Hummers' response to the summary judgment motion because it was filed after April 4, 2022—the trial court-imposed deadline for the Hummers to respond. We have a bright line rule for dealing with late responses to summary judgment motions: when the nonmovant fails to respond to a motion for summary judgment either within 30 days or by the trial court-imposed deadline, "the trial court ***cannot*** consider summary judgment filings of that party subsequent to" the relevant deadline. *Andry v. Thorbecke*, 218 N.E.3d 600, 603–04 (Ind. Ct. App. 2023) (emphasis added) (quoting *Mitchell v. 10th & The Bypass, LLC*, 3 N.E.3d 967, 972 (Ind. 2014)), *trans. not sought*. Based on our

bright line rule, we agree with the Personal Representatives' argument, so we will not consider the Hummers' late response to the Trial Rule 56 motion.

[17] Next, in their brief on appeal, the Hummers cite to parts of the Personal Representatives' designated evidence that were not relied upon by the Personal Representatives in their Trial Rule 56 motion and supporting brief. Because we cannot consider the Hummers' belated response to the motion, we also cannot consider any portions of the designated evidence not cited by the Personal Representatives in their Trial Rule 56 motion and supporting brief. *See* T.R. 56(C), (H); *Filip*, 879 N.E.2d at 1081.

[18] We now turn to the merits of the Personal Representatives' summary judgment motion regarding the Hummers' claims that Norma's will and codicil are invalid. Any interested person may contest the validity of a will based on "(1) the unsoundness of mind of the testator; (2) the undue execution of the will; (3) that the will was executed under duress or was obtained by fraud; or (4) any other valid objection to the will's validity or the probate of the will." Ind. Code § 29-1-7-17. In their complaint and on appeal, the Hummers assert that Norma's will and codicil are invalid because at the time she executed them, she was (1) of unsound mind and (2) subject to undue influence.[1]

---

[1] In their complaint, the Hummers also alleged that Norma's execution of her will and codicil was obtained by fraud. However, the Hummers do not make this argument on appeal or otherwise challenge the trial court's grant of summary judgment in favor of the Personal Representatives on this ground, so it is waived. *See* Ind. Appellate Rule 46(A)(8)(a); *Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015).

## 1. Unsound Mind

First, the Hummers contend that Norma was of unsound mind when she executed both the will and the codicil. As another panel of this court has explained:

> Every person is presumed to be of sound mind to execute a will. *Gast v. Hall,* 858 N.E.2d 154, 165 (Ind. Ct. App. 2006) (citing *Hays v. Harmon,* 809 N.E.2d 460, 464 (Ind. Ct. App. 2004), *trans. denied*), *reh'g denied, trans. denied.* To rebut this presumption, a party must show that the testator, at the time of executing his will, lacks the mental capacity to know: "(1) the extent and value of [her] property; (2) those who are the natural objects of [her] bounty; and (3) their deserts, with respect to their treatment of and conduct towards [her]." *Id.* It is the testator's mental capacity or soundness of mind at the time she executes the document at issue that is controlling. *Id.* However, evidence of the testator's mental condition before the date of execution is admissible as it relates to the testator's mental state at the time she executed the document at issue. *Id.*

*In re Rhoades*, 993 N.E.2d 291, 299 (Ind. Ct. App. 2013) (alterations in original).

Considering the specifically designated evidence in the light most favorable to the Hummers reveals that Norma intended to disinherit Kathy when she executed her will and reaffirmed that intent two years later when she executed her codicil. Several medical professionals determined Norma was alert and oriented as to time, place, people, and circumstances in the days leading up to the execution of her will. Kathy did not dispute the accuracy of these reports. At the time Norma executed her will and codicil, both Forcum and Thomas believed Norma knew where she was, who she was, and what she was doing;

understood her estate plan and its effect; and executed those documents freely and voluntarily. Kathy did not contend that Forcum and Thomas committed perjury by attesting to the soundness of Norma's mind and the free and voluntary nature of her execution of her will. Based on these undisputed facts, the Personal Representatives have met their prima facie burden of showing that Norma was of sound mind when she executed the will and codicil. Because the Hummers failed to file a timely response, they have not carried their burden of demonstrating a genuine dispute of material fact exists concerning Norma's soundness of mind. Therefore, the Personal Representatives are entitled to summary judgment in their favor concerning the Hummers' claim that Norma's will and codicil are invalid on this basis.

## 2. Undue Influence

Second, the Hummers argue that Norma executed her will and codicil while subject to undue influence. "Undue influence" is "the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." *Moriarty v. Moriarty*, 150 N.E.3d 616, 629 (Ind. Ct. App.) (quoting *In re Estate of Compton*, 919 N.E.2d 1181, 1185-86 (Ind. Ct. App. 2010), *trans. denied*), *trans. denied*, 159 N.E.3d 566 (Ind. 2020). To affect a will,

> undue influence must subjugate the mind of a testator to the
> wishes of the person exerting the influence. It must be such as to
> control the mental operations of the testator in the making
> thereof, overcome his power of resistance and oblige him to

> make a disposition of his property which he would not have
> made if left freely to act according to his own wishes and
> pleasures.

*Id.* (quoting *Lindinger v. Lindinger*, 126 Ind. App. 463, 466, 130 N.E.2d 75, 77 (1955)). "When considering whether a will is invalid because it is a product of undue influence," the court considers several factors, including the testator's mental state. *Moriarty*, 150 N.E.3d at 630 (citing *Nichols v. Est. of Tyler*, 910 N.E.2d 221, 229 (Ind. Ct. App. 2009)). The party contesting the will need not show "[c]omplete unsoundness of mind . . . ; rather, weakness of mind when combined with other factors is sufficient." *Id.* (quoting *Nichols*, 910 N.E.2d at 229).

[22] Undue influence "may flow from the abuse of a confidential relationship in which 'confidence is reposed by one party in another with resulting superiority and influence exercised by the other.'" *Moriarty*, 150 N.E.3d at 629–30 (quoting *Carlson v. Warren*, 878 N.E.2d 844, 851 (Ind. Ct. App. 2007)). "[A] confidential relationship sufficient to support an undue influence claim may arise either as a matter of law or may arise under the particular facts of a case." *Id.* at 629 n.7 (quoting *Scribner v. Gibbs*, 953 N.E.2d 475, 484 (Ind. Ct. App. 2011)). "Confidential relationships as a matter of law include relationships such as . . . attorney-in-fact and the one granting the power of attorney, guardian and ward, principal and agent, . . . and parent and child." *Id.* (quoting *Scribner*, 953 N.E.2d at 484). "A confidential relationship as a matter of law creates a presumption of undue influence." *Id.* (citing *Scribner*, 953 N.E.2d at

484). Here, the designated evidence demonstrates that a confidential relationship as a matter of law did not exist between the Personal Representatives and Norma.

[23] As another panel of this court has explained:

> Where there is no confidential relationship as a matter of law, the evidence in a given case may show a relationship of trust and confidence that would have justified one in relying upon that relationship. Instead of creating a rebuttable presumption of undue influence, the plaintiff in such a case bears the burden of establishing not only the existence of a confidential relationship in fact between the parties but also to prove that the parties to the challenged transaction did not deal on terms of equality. The plaintiff must prove either the dominant party dealt with superior knowledge of the matter derived from a fiduciary relationship, or dealt from a position of overpowering influence as to the subordinate party.

*Scribner*, 953 N.E.2d at 484 (internal citations and quotation marks omitted). "On occasion, we have held that the traditional parent-child relationship may be reversed, placing the child in the dominant position, if there is evidence that the child has become the parent's 'caretaker.'" *Id.* at 485 (citing *Meyer v. Wright*, 854 N.E.2d 57, 60 (Ind. Ct. App. 2006), *trans. denied*).

[24] Here, considering the specifically designated evidence in the light most favorable to the Hummers, that evidence shows that Wayne, Carolyn, and Mary began caring for Norma in approximately 2012, but they did not begin caring for her around-the-clock until February 2016, after she had already disinherited Kathy. At most, the designated evidence shows the Personal

Representatives helped one another provide part-time care for Norma prior to January 13, 2016. The designated evidence also shows that Wayne and Carolyn were not in the room when Forcum and Thomas discussed the will with Norma or when the will was executed.

[25] After Norma executed her will but before she executed her codicil, the Personal Representatives began providing around-the-clock care for her. That is, Norma spent a third of every day with each of the Personal Representatives. Mary was responsible for Norma's laundry, cleaning, and dispensing her medications. Carolyn was responsible for Norma's beautician needs, laundry, cleaning, and dispensing her medications. Wayne was responsible for paying Norma's bills, grocery shopping, and transporting her to appointments, including medical and legal appointments; he also contacted Forcum on Norma's behalf to initiate the preparation and execution of the codicil.

[26] These undisputed facts demonstrate that Norma did not solely rely on her relationship with any one of the Personal Representatives either at the time she executed or at the time she executed her codicil. Based on the foregoing, the Personal Representatives have shown that none of them had a confidential relationship as a matter of fact with Norma.

[27] As discussed above, even when viewed in the light most favorable to the Hummers, the specifically designated evidence demonstrates that Norma was of sound mind when she executed her will and codicil, and Norma, Forcum, and Thomas all averred that Norma executed those documents freely and

voluntarily. The designated evidence here does not support the idea that Norma disinherited Kathy for any reason other than her desire to fairly distribute her estate based on the care, or lack thereof, provided to her by her children. That is, the designated evidence shows that Norma was not susceptible to undue influence, let alone that any of the Personal Representatives successfully exercised undue influence over her. The Personal Representatives have carried their prima facie burden of showing that Norma was not subject to undue influence. Because the Hummers failed to file a timely response, they have not carried their burden of demonstrating a genuine issue of material facts exists concerning any alleged exercise of undue influence. Therefore, the Personal Representatives are entitled to summary judgment in their favor concerning the Hummers' claim that Norma's will and codicil are invalid on this basis.

## Conclusion

[28] In sum, when viewing the specifically designated evidence in the light most favorable to the Hummers, we cannot say that there is a genuine issue of material fact regarding Norma's soundness of mind or susceptibility to undue influence. The record reflects that Norma was not of unsound mind when she executed the will and codicil, nor was she unduly influenced to do so. Thus, Norma's will and codicil are not invalid on these grounds, and the Personal Representatives are entitled to judgment as a matter of law in their favor on the Hummers' claims to the contrary. We therefore affirm the trial court on all issues raised.

Affirmed.

Altice, C.J., and Bradford, J., concur.

ATTORNEY FOR APPELLANT

Chris M. Teagle
Anderson, Indiana

ATTORNEY FOR APPELLEE

Matthew L. Kelsey
DeFur Voran LLP
Muncie, Indiana