Joyce A. **MEYER**, Appellant–Plaintiff,

v.

Paul W. **WRIGHT**, Individually, Paul W. Wright and S. Anthony Long, Co–Personal Representatives of the Estate of Charles W. Wright, Deceased, and any and all heirs, Devisees and Interested Parties of the Estate of Charles W. Wright, Deceased, Appellees–Defendants.

No. 87A05–0509–CV–546.

Court of Appeals of Indiana.

Sept. 19, 2006.

Rehearing Denied Oct. 30, 2006.

ty in a contract, it is construed against its drafter.").

Leslie C. Shively, Evansville, IN, Attorney for Appellant.

Ronald Warrum, Evansville, IN, Attorney for Appellees.

## OPINION

HOFFMAN, Senior Judge.

Plaintiff–Appellant Joyce A. Meyer (Joyce) appeals the trial court's judgment

in favor of Defendants–Appellees Paul W. Wright (Paul), individually, and Paul W. Wright and S. Anthony Long (Long), as co-personal representatives of the estate of Charles W. Wright (Wright), deceased. We affirm.

Joyce presents one issue for our review, which we restate as: whether the trial court erred by determining that Paul and Long had rebutted the presumption of undue influence in the execution of the transfer of Wright's Merrill Lynch account and the real estate deed from Wright to Paul.

Joyce and Paul are Wright's only children. Long was Wright's attorney. In 1973, Wright had executed a will that essentially divided his estate equally between Joyce and Paul, should his wife predecease him. Wright's wife died in 1991. In February 1993, Long prepared a will at Wright's request which devised ten dollars to Joyce, the remainder of the estate to Paul, and named Long as the executor. The two substantial items contained in Wright's estate are a piece of real estate that has been described as containing approximately 177 acres and an account held with Merrill Lynch in Dayton, Ohio. In March 1993, Long prepared another will for Wright containing the same terms as the February 1993 will, but naming Long and Paul as co-executors.

Subsequently, Wright, Paul, Joyce and a witness all signed a hand-written document on November 11, 1995, giving Paul and Joyce joint power of attorney over Wright's affairs, as well as dividing his property, including his real estate and his investment account with Merrill Lynch, equally between Paul and Joyce. Long prepared yet another will for Wright which was executed on November 21, 1995, and which set forth terms consistent with the hand-written document executed ten (10) days prior. Wright also executed a revocation of power of attorney on November 21, 1995, revoking the purported joint power of attorney he had signed on November 11, 1995.

On December 12, 1995, Wright executed documents to convert his Merrill Lynch account from an individual account to a joint account held by he and Paul. In addition, Wright executed his final will on December 28, 1995. In this will, Wright devised ten dollars to Joyce and the remainder of his estate to Paul. Wright also executed, on November 12, 1997, a warranty deed to Paul for the 177 acres of real estate but retained a life estate in the property for himself. In April 2000, Wright executed a power of attorney in favor of Paul, and Wright died on August 13, 2000. The December 1995 will was admitted to probate on August 31, 2000, and on January 30, 2001, Joyce filed her complaint to contest the will and the transfers of property by Wright. Following a bench trial, the court entered its findings of fact and conclusions of law and determined that Paul and Long had shown by clear and convincing evidence that the transactions at issue were free of undue influence from Paul. It is from this determination that Joyce now appeals.

When the trial court enters findings of fact and conclusions of law, we apply a two-tiered standard of review: first, we determine whether the evidence supports the findings and, second, whether the findings support the judgment. *S.C. Nestel, Inc. v. Future Const., Inc.*, 836 N.E.2d 445, 449 (Ind.Ct.App.2005). The trial court's findings and conclusions will be set aside only if they are clearly erroneous. *Id.* "Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them." *St. John Town Bd. v. Lambert*, 725 N.E.2d 507, 518 (Ind.Ct.App. 2000). A judgment is clearly erroneous when it is not supported by the findings of

fact. *Id.* Put another way, a judgment is clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. *S.C. Nestel, Inc.,* 836 N.E.2d at 449. In determining whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id.* Moreover, we will not reweigh the evidence or assess witness credibility. *Id.*

There exist in this state certain legal and domestic relationships that raise a presumption of trust and confidence as to the subordinate party on the one hand and a corresponding influence as to the dominant party on the other. *In Re Estate of Wade,* 768 N.E.2d 957, 961 (Ind.Ct.App.2002), *trans. denied.* Relationships included in this category are those of attorney and client, guardian and ward, principal and agent, pastor and parishioner, and parent and child. *In Re Supervised Estate of Allender v. Allender,* 833 N.E.2d 529, 533 (Ind.Ct.App.2005), *reh'g denied, trans. denied.*[1] However, this list is not necessarily exhaustive. *Id.* In such cases, if the plaintiff's evidence establishes (a) the existence of such a relationship, and (b) the questioned transaction(s) between the parties resulted in an advantage to the dominant party in whom the subordinate party had placed his or her trust and confidence, the law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and, therefore, void. *Id.* The burden of proof then shifts to the dominant party to rebut the presumption by clear and unequivocal proof that the questioned transaction was made at arm's length and was thus valid. *Id.* Undue influence has been defined as " 'the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised.' " *In Re Estate of Wade,* 768 N.E.2d at 962 (*quoting Crider v. Crider,* 635 N.E.2d 204, 210 (Ind.Ct.App.1994), *reh'g denied, trans. denied*). A judgment entered in favor of the dominant party must be reviewed on appeal as to whether the judgment is contrary to law, as well as to whether the dominant party's evidence is sufficient to sustain the judgment that the presumption has been rebutted under the clear and unequivocal proof standard. *Outlaw v. Danks,* 832 N.E.2d 1108, 1110 (Ind.Ct.App.2005), *trans. denied,* 841 N.E.2d 188.

In the present case, we have the fiduciary relationship of parent and child. Generally, the parent is the dominant party and the child is the subordinate party. Here, however, the parties are reversed. By virtue of being Wright's caretaker, Paul, the child, is in the position of dominance. *See In Re Supervised Estate of Allender,* 833 N.E.2d at 533–34 (finding that son, who was caretaker of his ailing parents, had fiduciary relationship of parent-child, but in reverse, to which presumption of undue influence still applied).[2]

1. The relationship of husband and wife is no longer included in this category. *See Womack v. Womack,* 622 N.E.2d 481, 483 (Ind.1993) (stating that presumption of undue influence is an antiquated rule of law and holding that courts of this state no longer recognize presumption of undue influence in transaction between spouses such that the burden of proof is with a spouse seeking to set aside a transaction to establish that the other spouse exercised undue influence).

2. This Court has determined that holding a power of attorney creates a fiduciary relationship. *See Villanella v. Godbey,* 632 N.E.2d 786 (Ind.Ct.App.1994). Here, Wright executed a purported joint power of attorney in favor of Paul and Joyce on November 11, 1995. However, Wright revoked that joint

In addition to the fiduciary relationship, there were transactions that resulted in an advantage to Paul, the dominant party. Particularly, in December 1995, Wright added Paul as a joint tenant with rights of survivorship on his account with Merrill Lynch, and, in November 1997, Wright executed a deed conveying to Paul a parcel of real estate that contained approximately one hundred and seventy-seven (177) acres. Thus, the fiduciary relationship coupled with the transfer of substantial assets gives rise to the presumption that the transactions were the result of undue influence. *See In Re Supervised Estate of Allender*, 833 N.E.2d at 533.

At the hearing of this case, several witnesses testified not only as to their interaction with Wright but also as to their observations of Wright's interaction with each of his children. Long testified that his representation of Wright began in 1993 when he prepared a will for Wright. Under the terms of this February 1993 will, Wright gave ten dollars to Joyce, left the remainder of his estate to Paul and named Long as executor. In March 1993, Wright executed another will that contained the same terms as that of the February 1993 will but changed the executor from Long to Long and Paul as co-executors. When Long questioned Wright about his devise to Joyce, Wright explained that he was leaving Joyce only ten dollars because she had told him not to come around her house and because she had gotten mad that he had not given her any money to balance the money he had provided to Paul for the purchase of a vehicle. Wright also told Long that Joyce was being greedy and did

not call to check on him when he was ill. Wright stated that Paul, on the other hand, helped Wright all the time by visiting him regularly, taking him out to dinner, and taking him to the doctor. Long testified that Wright expressed concern about Joyce's reaction when she discovered the terms of his will.

At the suggestion of Long, Wright was seen by his doctor, Layne Robinson, with regard to Wright's competency to execute a will. Dr. Robinson sent a letter to Long on April 9, 1993, indicating that he found Wright mentally competent to write a will.

Subsequently, in November 1995, Long received a document that had been handwritten by Joyce and signed by Wright, Paul, Joyce, and a witness. This document stated that all of Wright's estate, including the real estate and the Merrill Lynch account, were to be divided equally between Paul and Joyce. After receiving this document and conversing with Wright, Long prepared another will for Wright. This will was executed on November 21, 1995, and named Long and Paul as co-executors. It provided, as the handwritten document had provided, that Wright's entire estate be divided equally between Paul and Joyce. At the time of execution in Wright's hospital room, Long expressed his concern to Joyce that the will did not evince Wright's true wishes for the devise of his estate, and he refused to witness the will due to his belief that Wright was acting under Joyce's duress to execute this particular will. Long observed that Joyce was quite agitated and that there was a feeling of animosity in the room. At one

---

power of attorney just ten (10) days later on November 21, 1995. Wright subsequently gave Paul power of attorney over his affairs in April 2000. However, the transactions at issue here (i.e., the transfer of the Merrill Lynch account and the real estate deed) took place in December 1995 and in 1997, respectively. Therefore, at the time of the questioned transactions there was no power of attorney in place, and we make a determination in this case only with regard to the fiduciary relationship of parent-child; although, we note that the result would be the same.

point, Joyce left the room to fax the will to another attorney to review. Long testified that Joyce had taken an "aggressive stance with regard to [Wright] and his property." Tr. at 51.

On December 12, 1995, less than a month after executing the November 21, 1995 will, Wright executed certain documents to add Paul as a joint tenant with rights of survivorship to his Merrill Lynch account so that, upon Wright's death, Paul would become the owner of the account. Later that month, on December 26, 1995, Long met with Wright, and Wright indicated to Long that he wanted to change his will to leave everything to Paul. Long testified that at this meeting, Wright had told him that Joyce had learned of the conversion of the Merrill Lynch account and had threatened to sue over the account no matter what Wright did with the remainder of his property. When Long inquired as to whether Paul had asked Wright to make any changes, Wright answered that he had not. On December 28, 1995, Wright executed another will that provided for Joyce to receive ten dollars and for Paul to receive the remainder of Wright's estate. This will was admitted to probate on August 31, 2000.

Sherry Drew, Long's secretary, testified that when Paul would bring Wright in for an appointment with Long, Paul would wait in the waiting area while Wright went in to Long's office. Long, too, testified that his standard and customary office practice was for only he and the client to be in the office when they were discussing confidential matters such as estate planning. He stated that there was no exception to this practice when Paul brought Wright to the office. Further, both Drew and Long stated unequivocally that in the father-son relationship, Wright was the dominant one. Drew also said that Wright was always giving Paul advice and telling

Paul how things should be done. She additionally testified that it was only a matter of days after Wright executed the November 21, 1995 will dividing everything equally between Joyce and Paul that he called the office to have it changed. He indicated that he had executed the will so that Joyce would cease being angry with him and cease yelling at him. Drew also described an incident at the nursing home for which she and Long were present when Joyce and Wright had an unpleasant discussion and Long intervened to defend Wright.

Finally, in November 1997, Wright executed a deed conveying to Paul a remainder interest subject to Wright's life estate in the 177 acres of real estate. Long testified that this deed was executed after several discussions with Wright where he voiced his concerns that Joyce would sue Paul and Paul would not get what was devised to him. The Merrill Lynch account had been taken care of by the execution of documents in December 1995, but the real estate remained a concern of Wright's. Long again suggested that Wright be examined by Dr. Robinson, and in October 1997, Dr. Robinson evaluated Wright's competency. Dr. Robinson found that Wright had good long-term and short-term memory at that time. Dr. Robinson admitted that an opinion regarding competency on October 30 would not necessarily mean that Wright would have been competent twelve days later at the time the deed was executed, but Dr. Robinson testified that it was his opinion that from 1993 to 1997 Wright was competent, was able to understand the extent of his property and what he wanted to do with it.

Long also testified that at no time in his representation of Wright did Wright ever evidence anything other than complete competency. He further specifically said that he believed Wright to be competent

on December 12, 1995 when he executed the paperwork to convert his Merrill Lynch account from an individual account to a joint account with Paul and when he executed the deed in November 1997.

Lisa Fields, an expert hired by Joyce to review Wright's medical records, testified that in her professional opinion Wright suffered from dementia from 1995 to 1998. However, she never examined Wright; rather, her opinion was based only upon her review of his medical records.

The last five years of his life, Wright resided at Baker's Rest Haven. Rita Loehr, a nurse for thirty-one years who had worked at Baker's Rest Haven for fourteen years, testified that she saw Joyce only one time; however, she stated that she worked the day shift. Loehr and David Batts, the administrator of Baker's, both described a time that Wright was very upset because Joyce had been to visit him and had brought a minister with her to try to get Wright to change his will. In addition, both Loehr and Batts related that over the course of several years Wright repeatedly said that he gave Joyce an education so that she could provide a living for herself. Paul, on the other hand, stayed to help on the farm, take care of Wright, and do what Wright needed him to do, so Paul would get the money and the farm.

Loehr further noted that Paul came to see Wright on a daily basis and did whatever Wright wanted him to do. Batts also testified that in the father-son relationship, Wright was the dominant party. Further, it is both Loehr's and Batts' belief that Wright's intellect was superior to Paul's. Loehr described Wright as being mentally alert and active until the very end of his life, and Loehr and Batts discussed Wright's piano playing and recitation of poetry. Loehr further described Wright's pride when he spoke of his investments and business transactions, of which he appeared to be fully aware.

Likewise, Mary Jane Ambrose, who handled admissions and social services at Baker's Rest Haven, testified that Wright was intelligent and took care of all his business himself. She also stated that in Wright's relationship with Paul, Wright was in control, and Paul did whatever Wright wanted him to do.

Laura Lassack, a nurse at Cypress Grove rehabilitation center where Wright lived for a very short period of time in late 1995, testified that Wright's chart contained a note that the said Wright's son had power of attorney and Wright's daughter was not allowed to visit. She also described an incident in which Wright told her that he had gotten upset with his daughter and that his son had taken him to an attorney and had him sign a new will leaving his daughter out of his estate. Lassack stated that Wright indicated he was feeling badly about that decision and asked Lassack to call his daughter and tell her that Wright loved her and that he was sorry.

There is ample evidence that it was Wright's intent to leave the bulk of his estate to his son Paul. Paul visited Wright nearly every day, took him to his doctor appointments, to the bank and out to dinner. Paul looked to his father for advice and guidance, and Wright maintained the patriarchal and head of household position with regard to Paul even after living in a nursing home for several years. Therefore, Paul was the natural object of Wright's bounty. In contrast, Wright's relationship with Joyce was tumultuous, by all accounts. Additionally, although Fields stated an opinion of Wright's declining mental competency based only on paper records, Dr. Robinson, who examined Wright during routine face-to-face office visits, including two visits specifically for

evaluating competency, found Wright to be competent. Moreover, the people who had daily contact with Wright testified as to his competency. Thus, Paul and Long rebutted the presumption of undue influence with clear and convincing evidence.

Based upon the foregoing discussion and authorities, we conclude that a presumption of undue influence arose in this case because Paul was in a fiduciary relationship with Wright at the time of the questioned transactions, and the transactions benefited Paul. We further conclude that the trial court did not commit error by finding that Paul and Long rebutted the presumption of undue influence in this case and by entering judgment in their favor.

Affirmed.

DARDEN, J., and MATHIAS, J., concur.