**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEYS FOR APPELLANTS:

**BRYAN RUDISILL**
Rockport, Indiana

**MARK K. PHILLIPS**
Boonville, Indiana

ATTORNEY FOR APPELLEE:

**S. ANTHONY LONG**
Long & Mathies
Boonville, Indiana

FILED

Feb 14 2012, 9:36 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| RICHARD WILLIAMS, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARY LEE ENLOW, Deceased, and VICKIE LEE WILLIAMS, <br><br> Appellants-Defendants, <br><br> vs. <br><br> KEVIN HEAVNER, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF NORMAN HEAVNER, Deceased, <br><br> Appellee-Plaintiff. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     No. 87A05-1104-PL-235 |

APPEAL FROM THE WARRICK SUPERIOR COURT
The Honorable Robert R. Aylsworth, Judge
Cause No. 87D02-0511-PL-387

**February 14, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellants-Defendants, Richard Williams, as personal representative of the Estate of Mary Lee Enlow, Deceased, and Vickie Lee Williams (collectively, the Williamses), appeal the trial court's judgment in favor of Appellee-Plaintiff, Kevin Heavner, as personal representative of the Estate of Norman Heavner, Deceased, with respect to the transfer of certain assets from Norman Heavner (Norman) to Mary Lee Enlow (Mary) upon Norman's death.

We affirm.

ISSUES

The Williamses present four issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court abused its discretion when it concluded that Mary was not entitled to certain monetary withdrawals from a bank account jointly owned by Mary and Norman prior to Norman's death; and

(2) Whether the trial court abused its discretion when it concluded that Mary was not entitled to the proceeds of certain annuities and insurance policies because of undue influence.

## FACTS AND PROCEDURAL HISTORY[1]

Mary and Norman met after Mary placed a newspaper advertisement seeking male companionship in a local newspaper. They met for the first time on or about December 31, 2002 and immediately began living together. At the time of their meeting, Mary was 76 years of age and Norman was 78 years of age; both Mary and Norman had been involved in several prior relationships.

In the Spring or Summer of 2004, Norman met with Randy Voight (Voight) a financial advisor at Edward Jones, who helped Norman with several change of beneficiary requests. Specifically, on or about June 1, 2004, Norman executed an annuity policy change form to make Mary the beneficiary of his Transamerica Life Insurance. Also, on or about November 24, 2004, Mary recorded with the Warrick County Recorder's Office a Request for Change of Beneficiary to an AXA Equitable Life insurance policy in Norman's name.

Mary and Norman also had a joint bank account. On December 30, 2004, Mary withdrew $8,903.50 to prepay her funeral arrangements. Also, on January 5, 2005, Mary withdrew $3,620.93 from their joint account. She transferred from the joint account $18,000 on January 13, 2005 and another $2,000 on February 4, 2005.

On February 11, 2005, Norman died. On June 1, 2005, Kevin Heavner (Heavner), one of Norman's surviving children, opened an estate on Norman's behalf. On

_____

[1] We remind both parties that the Statement of the Facts section of an appellate brief is not an appropriate place to litigate or develop argument but rather should contain the facts relevant to the issues presented for review. *See* Ind. Appellate Rule 46(A)(6).

November 14, 2005, Mary died and Richard Williams (Williams), Mary's son-in-law, was appointed the personal representative of Mary's estate.

On November 1, 2005, Heavner, as personal representative of Norman's estate, filed a Complaint against Mary[2] and Mary's daughter, Vickie Lee Williams. In his Complaint, Heavner alleged undue influence and fraud in the change of beneficiary on Norman's insurance policies and in the withdrawal of money from Mary and Norman's joint bank account. A bench trial was conducted on October 27-30, 2008; December 1-2, 2008; February 26, 2009; November 16-17, 2009; June 22, 2010; and November 22, 2010. On January 28, 2011, the trial court issued its findings and conclusions, entering judgment in favor of Heavner. On February 28, 2011, the Williamses filed a motion to correct error, which was denied on March 22, 2011.

The Williamses now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Here, the trial court entered findings of fact and conclusions of law. As such, we apply a two-tiered standard of review: first, we determine whether the evidence supports the findings and, second, whether the findings support the judgment. *Meyer v. Wright*, 854 N.E.2d 57, 59 (Ind. Ct. App. 2006), *trans. denied*. The trial court's findings and conclusion will be set aside only if they are clearly erroneous. *Id*. Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id*. A judgment is clearly erroneous when it is not supported

---

[2] Upon her death, Mary was substituted by Williams, the personal representative of her estate.

4

by the findings of fact. *Id*. at 60. Put another way, a judgment is clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. *Id*. In determining whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id*. Moreover, we will not reweigh the evidence or assess witness credibility. *Id*.

## II. *Joint Bank Account Transfers*

First, the Williamses contend that the trial court erred by awarding Heavner the sums that Mary had transferred from the account she owned jointly with Norman. Specifically, the trial court concluded

> 8. Count VI (motion to set aside transfer of Fifth Third Bank accounts) – [Heavner] has proved by a preponderance of the evidence that [Mary] did on December 30, 2004 pay from funds in [Norman's] Fifth Third account the amount of $17,863.70 for prepaid funeral expenses for herself and [Norman], the sum of $8,903.50 paid toward her own prepaid funeral expenses through Browning Funeral Home in Evansville, Indiana. Although by this time [Mary] was shown on accounts 759 and 852 as a joint owner with [Norman], the evidence establishes that all funds in these accounts originated from [Norman] and none of these funds originate from [Mary]. As such, [Heavner] is entitled to judgment in this count in the amount of $8,903.50 plus prejudgment interest at the rate of 8% per annum from December 30, 2004 to the date of this judgment.
>
> * * *
>
> 10. Count VIII (complaint to set aside transfer of checking account proceeds) – [Heavner] has proved by a preponderance of the evidence the right to judgment as to the amounts taken by [Mary] from [Normans's] account number 759 and 852 prior to his death on February 11, 2005. Even though she was shown as a joint owner of these accounts at that time, as stated before the evidence shows that all funds in these accounts originated with [Norman], and none originated with [Mary]. As such, [Heavner] is entitled to judgment in this count for the $3,620.93 taken by [Mary] to close account number 852 on January 5, 2005, the $18,000.00 transferred from account number 759 to [Mary's] account number 5473 on January 4,

5

2005.  [Heavner] is also entitled to recover prejudgment interest at the rate of 8% per annum on each of these amounts from the date of each transfer to the date of this judgment on Count VIII.

(Appellant's App. pp. 17-18).

In response to the trial court's judgment, the Williamses assert that based on the evidence that Mary and Norman lived as husband and wife even though they were never married and Norman's indication not to leave any property to his children, it was Norman's intent "that Mary should be able to use the account assets as her own." (Appellant's Br. p. 11).

In Indiana, the nature of joint accounts is statutorily defined in Ind. Code § 32-17-11-17.  In particular, I.C. § 32-17-11-17(a) stipulates the ownership of joint accounts during the lifetime of the account owners as "[u]nless there is clear and convincing evidence of a different intent, during the lifetime of all parties, a joint account belongs to the parties in proportion to the net contributions by each party to the sums on the deposit."  In other words, the general rule is joint ownership in proportion to the respective contributions unless a different intent can be shown.

In support of their argument that Mary and Norman indicated a different intent, the Williamses point to testimony establishing the shared affection and care between Mary and Norman and their living together as if they were husband and wife.  They also focus on testimony by David Krueger (Krueger), Mary and Norman's accountant, who testified during trial that

> This is oh, roughly six months after they were living together, and this is what she told me.  She said that [Norman] didn't want his children to inherit anything, and that he wanted her, and she said, either to have his

6

money or take care of his money for him. Which I thought was unusual 'cause they didn't know each other very long.

(Appellant's App. p. 274).

Based on this evidence, we do not find that the applicability of the general rule has been avoided. A simple reference by Krueger to Mary's self-serving statements is not enough to evince a clear and convincing "different intent."[3] *See* I.C. § 32-17-11-17(a). Moreover, turning to the ownership of the joint account in proportion to the contribution by each party, we note that the Williamses do not refer us to any evidence establishing that Mary financially contributed to the joint account—nor does the record contain any— or that the sums transferred by Mary were used to take care of Norman's needs. Therefore, the trial court's findings and conclusions are not clearly erroneous and we will not disturb the trial court's judgment.

### III. *Undue Influence*

Next, the Williamses dispute the trial court's conclusion that Heavner "has proved by a preponderance of the evidence the right to a judgment" regarding the Transamerica Life Insurance Company annuity and the proceeds of the AXA Equitable Policy. (Appellant's App. p. 19). During his lifetime, Norman was the sole owner of an annuity with Transamerica Life Insurance Company and with AXA Equitable Company. Prior to his death, Mary, acting as Norman's attorney-in-fact, executed a change of beneficiary form naming herself the primary beneficiary to the proceeds of both policies. After

---

[3] Although the Williamses also point to similar testimony by Randy Voight (Voight), Norman's financial advisor, Voight's testimony relates to the change in beneficiaries on Norman's insurance policies, not to the joint account.

7

Norman's death, Heavner challenged this change of beneficiary on the basis of fraud and undue influence. Specifically, Heavner noted that during her deposition testimony prior to her death, Mary admitted to signing Norman's name to the Power-of-Attorney she used to get the primary beneficiary changed. However, in its judgment, the trial court expressly stated that

> 5. [] [Heavner] proved by a preponderance of the evidence that [Mary] altered, forged or wrongfully created one or more documents purportedly created or signed by [Norman], including a purported power of attorney showing an execution date of the 8th of September. The evidence further proves by a preponderance of the evidence that [Mary] copied and transferred notary blocks/acknowledgments from one document to another during the time she and [Norman] cohabited with one another. Even with this finding by the court, the existence or non-existence of a valid power of attorney does not relate to or affect the court's findings and judgment on the most significant issues un this case, since they were not generated by her use of a purported power of attorney.

(Appellant's App. p. 16). Moreover, after excluding Mary's fraud in the creation of a Power-of-Attorney, the trial court was silent with regard to the actual basis of its conclusion that Heavner was entitled to the proceeds of both policies and merely noted that Heavner had proved by a preponderance of the evidence the right to a judgment. As Heavner alleged both fraud and undue influence in his Complaint and both parties briefed the issue based on undue influence, we will proceed under the assumption that the trial court found undue influence in the change of beneficiary on both insurance policies.

In Indiana, various legal and domestic relationships raise a presumption of confidence and trust as to the subordinate party on the one hand and a corresponding influence as to the dominant party on the other. *In re Estate of Wade*, 768 N.E.2d 957, 961 (Ind. Ct. App. 2002). These relationships include, among others, attorney and client,

8

guardian and ward, principal and agent, pastor and parishioner, and parent and child. *In re Supervised Estate of Allender v. Allender*, 833 N.E.2d 529, 533 (Ind. Ct. App. 2005), *reh'g denied, trans. denied*.[4] However, this list is not necessarily exhaustive. *Id.* In such cases, if the plaintiff's evidence establishes (a) the existence of such a relationship and (b) the questioned transaction(s) between the parties resulted in an advantage to the dominant party in whom the subordinate party had placed his or her trust and confidence, the law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent and, therefore, void. *Meyer*, 854 N.E.2d at 60. The burden of proof then shifts to the dominant party to rebut the presumption by clear and unequivocal proof that the questioned transaction was made at arm's length and was thus valid. *Id.* Undue influence has been defined as "the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control would not have been exercised." *Id.*

A. *Existence of Fiduciary Relationship*

In this case, a fiduciary relationship existed between Mary, as caregiver, and Norman, as the recipient of Mary's care. The record establishes that Mary did the household chores, she got water for him when he needed it—even though he was able to get it himself—and answered the phone "even if the phone was sitting next to []

---

[4] The relationship of husband and wife is no longer included in this category. *See Womack v. Womack*, 622 N.E.2d 481, 483 (Ind. 1993) (stating that presumption of undue influence is an antiquated rule of law and holding that courts of this state no longer recognize presumption of undue influence in transaction between spouses such that the burden of proof is with a spouse seeking to set aside a transaction to establish that the other spouse exercised undue influence). Here, although Mary and Norman held themselves out as husband and wife, they were not actually married.

9

Norman." (Appellant's Suppl. App. p. 30). When Norman incurred physical problems getting around the house, Mary put in a wheelchair ramp, installed handrails in the hallways, and replaced the carpet so Norman could continue to reside in her house. When Norman was hospitalized, Mary stayed overnight at the hospital and helped feed him. Moreover, when questioned about the relationship, Krueger stated that based on his observations Mary was dominant in the relationship as "she did all that talking. She brought in all the paperwork . . . and [Norman] – [Norman] said very little." (Appellant's App. p. 276). We find that the existence of this fiduciary relationship coupled with the transfer of substantial assets from Norman to Mary as beneficiary of his insurance policies, resulted in an advantage to Mary, raising the presumption of undue influence.

### B. *Rebuttal of Presumption*

Because the presumption of undue influence is raised, the burden of proof shifts to the Williamses to establish by clear and unequivocal proof that the questioned transactions were made at arm's length and thus valid. *See Meyer*, 854 N.E.2d at 60. To satisfy this burden, the Williamses refer to the testimony of several individuals with close ties to both Mary and Norman who stated that the relationship was one of mutual respect and affection and was presented to the outside world as a committed relationship tantamount to marriage.

Also, Randy Voight (Voight), Norman's financial adviser at Edward Jones, stated that on several occasions, Norman had told him that "he did not have a good relationship with his children, and wanted to change all of his beneficiaries[.]" (Appellant's App. p. 567). Voight also testified that when Norman was completing the beneficiary

10

designation for his Edward Jones account[5], he overheard Mary encouraging Norman to leave something to his children. Norman refused and asked Mary to leave the room. Likewise, Wanda Powell, a financial services representative with Fifth Third Bank who notarized Norman's signature on the Edward Jones paperwork, stated that she would not have notarized the signature if she had perceived Norman to be incompetent or under duress.

The evidence further reflects that prior to meeting Norman, Mary typically visited her daughter every five to six weeks, After Norman started to reside with her, he refused to make the trip, therefore, Mary stopped going as well. While Norman was living with Mary, Mary's only grandson, who she was close to, got married in Las Vegas. Mary did not attend the wedding because Norman did not want to go, even though her daughter offered to pay for her and Norman's travel and accommodations.

In response, Heavner draws this court's attention to the testimony of Arlene Berry (Berry), Norman's daughter. Berry stated that when Norman gave her money Mary "wouldn't say too much in front of me at first, she'd give him a look, and then he told me that he caught hell for [it]." (Appellant's App. p. 97). She added that she was not allowed to see her father alone. Phyllis Hughes (Hughes), one of Mary's tenants, testified that the assistant pastor of Mary's church "got Norman's money through Mary. He got his house paid off. Mary overpaid for it, giving the pastor's wife some of Norman's money too. She used Norman's money to buy a truck for him." (Transcript p.

---

[5] It should be noted that the trial court's award of the proceeds of the Edward Jones account to Mary is not disputed by Heavner on appeal.

11

336).  Hughes also stated that after she gave her deposition in this case, Mary came up to her and told her that she had blown "it now, I'm going to lose all that money, everything, because of you." (Tr. p. 338).  Mary would get angry and on one occasion, Mary took out a gun and pointed it toward her own head.  Leedra Adams (Adams), also one of Mary's tenants, testified that immediately prior to Hazel Moore's (Moore) deposition, Adams drove Mary to the bank where she withdrew $3,000.  When she returned to Adam's car, Moore contacted Mary on her cell phone and Mary told her that "I have the $3,000." (Tr. p. 385).  When Adams inquired after Mary's plans for the $3,000, Mary responded "you can't know nothing about none of this[.]" (Tr. p. 385).  Finally, Heavner references Krueger's statement during trial that based on his observations Mary was the dominant party in the relationship.

Mindful of our standard of review, we cannot say that we are firmly convinced that a mistake has been made.  Although a presumption of undue influence arose because Mary was in a fiduciary relationship with Norman at the time of the questioned transactions, and the transactions benefitted her; we find that the evidence presented by the Williamses did not rebut the presumption.  We affirm the trial court.

CONCLUSION

Based on the foregoing, we find that the trial court did not abuse its discretion when it concluded that Mary was not entitled to certain monetary withdrawals from a bank account jointly owned by Mary and Norman prior to Norman's death; and the trial court did not abuse its discretion when it concluded that Mary was not entitled to the proceeds of certain annuities and insurance policies because of undue influence.

12

Affirmed.

FRIEDLANDER, J. and MATHIAS, J. concur