## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 20 2016, 10:28 am

CLERK
of the supreme court,
court of appeals and
tax court

---

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
| --- | --- |
| Thomas M. Barr | Stephen J. Harants |
| Tomas M. Barr & Associates | Miller & Harants |
| Nashville, Indiana | New Haven, Indiana |

---

IN THE

# COURT OF APPEALS OF INDIANA

---

Charles E. Gatewood, II, and
Rita L. Gatewood,

*Appellants-Defendants,*

v.

John A. Gatewood, as Personal
Representative of the Estate of
Margaret H. Gatewood

*Appellee-Plaintiff.*

January 20, 2016

Court of Appeals Case No.
07A01-1503-EM-108

Appeal from the Brown Circuit
Court

The Honorable Judith A. Stewart,
Judge

Trial Court Cause No.
07C01-1112-EM-42

---

**Mathias, Judge.**

[1]     Charles E. Gatewood, II a/k/a Chip ("Chip") and Rita L. Gatewood ("Rita")

appeal the judgment of the Brown Circuit Court in favor of John A. Gatewood,

as personal representative of the Estate of Margaret H. Gatewood ("the Estate")

in the Estate's action against Chip and Rita. On appeal, Chip and Rita (collectively "the Defendants") present two issues for our review, which we consolidate and restate as whether the trial court properly applied a presumption of undue influence in Chip's and Rita's transactions with the decedent.

We affirm.

## Statement of Facts

The decedent in this case, Margaret Gatewood, had three children with her husband, Charles Gatewood, Sr., namely: Suzanne Zupancic ("Suzanne"), Chip, and John Gatewood ("John"). Margaret also had a granddaughter, Laurie Linback ("Laurie") who was Suzanne's daughter. Charles, Sr. passed away in 1999.

Chip married Rita in 1984. From that date until 2009, Chip and Rita lived in a mobile home on property adjacent to Margaret's home. Both Chip and Rita helped Margaret with mowing and other upkeep on her property, especially after the death of Charles, Sr.

Margaret was an independent and strong-willed woman most of her life. When her husband was alive, he and Margaret would make an annual trip to Disney World in Florida, staying at a campground at the park from January to March. After her husband's death, Margaret continued to spend the winter months in Florida. By 2007, Margaret showed signs of slowing down. Although she was

able to live by herself and even travel to Florida, Margaret began to suffer from memory loss and had issues maintaining her balance.

[6] When Margaret was in Florida in the winter of 2007, Laurie reviewed Margaret's checkbook and found checks that had been made but not recorded, which was very unusual. She also noticed that some of these unrecorded checks had been made out to Chip and Rita when Margaret was in Florida. Shortly thereafter, Margaret removed Rita as a signatory from her bank accounts and her certificates of deposit and instead added Laurie as a signatory. In April of 2007, Laurie then obtained power of attorney from Margaret.

[7] Margaret again made her annual trip to Florida in 2008 with Laurie accompanying her, but Margaret's condition gradually worsened. In the winter of 2009, Margaret again made her annual trip to Florida, this time without Laurie. Laurie received a call from Margaret's neighbor in Florida who was concerned with Margaret's welfare. Laurie attempted to contact her grandmother in Florida but could not reach her. Concerned for Margaret's wellbeing, Laurie and her mother Suzanne traveled to Florida to check on Margaret. There, they found Margaret living in squalid conditions: the home was filthy, feces were on the carpet, and Margaret was apparently not taking her medications, as the medicines were unopened. Margaret also appeared not to have bathed since she had arrived a month ago, and she had lost a substantial amount of weight. Laurie and Suzanne cleaned Margaret up and flew back to Indiana with her a few days later.

[8]     Once in Indiana, Laurie took Margaret to her family physician, who referred her to neurologist Doctor Abdulkarin Sharba ("Dr. Sharba"). When Dr. Sharba examined Margaret on March 11, 2009, she was unable to read or write a sentence, and she was disoriented as to both her location and the current year. Dr. Sharba diagnosed Margaret with at least moderate dementia.

[9]     With the agreement of all of the family, Margaret was admitted to the Methodist Home in Franklin, Indiana, for rehabilitation and physical therapy. Chip and Rita claim that they did not intend for Margaret to permanently remain in the nursing home and considered the move only temporary. Eventually, however, it became more clear that Margaret's stay in the home was going to be long-term, if not permanent. Laurie began to seek guardianship over her grandmother in March 2009.

[10]    Margaret, who was still strong-willed, did not wish to remain in the nursing home. On April 27, 2009, Margaret was taken to an attorney by Chip and Rita where she executed a new power of attorney instrument removing Laurie as her attorney-in-fact and naming Chip as her attorney-in-fact. Chip paid the fees for preparing this change in the power of attorney. When Laurie learned of the change in the power of attorney, she abandoned her efforts to establish a guardianship. Laurie turned over to Chip all of Margaret's financial information and papers. Among these was a will that was executed in Laurie's presence. This will was never submitted to probate.

[11] At the end of April and the beginning of May 2009, Chip moved his mother back to her home. Chip and Rita moved out of their mobile home and moved in with Margaret. Rita eventually quit her job at a grocery store to help care for Margaret, as did Chip after he suffered a heart attack. When Chip and Rita were living with Margaret, Margaret's money was used to pay all of the bills, and Chip and Rita paid no rent. They did, however, rent out their mobile home for $400 or $500 per month. Once Chip and Rita moved in with Margaret, they limited her contact with the other members of the family. Laurie was told that she was not allowed to go to the home, and John was only allowed to visit with his mother if either Chip or Rita were with him. On occasion, John's visits were even monitored using a baby monitor.

[12] As his mother's attorney-in-fact, Chip took care of Margaret's finances. He helped her close certain bank accounts and open other accounts. However, his efforts to keep his money and his mother's money separate were not successful. Indeed, Chip admitted that his money and Margaret's money were "all the same." *See* Appellant's App. p. 19. Typically, Chip paid for his mother's expenses out of her accounts, but he sometimes used his and Rita's accounts and reimbursed himself from Margaret's accounts. Other than some notations in the memo lines of the checks such as "food," Chip did not maintain records of how he used his mother's money.

[13] Additionally, Rita used two credit cards that were in Margaret's name. She used these cards to pay pharmacy and medical bills and other household expenses in addition to almost $5,000 in balance transfers from other credit

cards. Although Rita used these cards mostly for Margaret's medicine and expenses, she also used them to pay for items for herself, with Margaret's permission. Chip, however, was unaware of these cards, and Rita gave the credit card bills directly to Margaret who asked her not to discuss the bills with Chip.

[14] Between August 14, 2010, and October of the next year, Chip, acting as Margaret's attorney-in-fact, wrote checks on Margaret's accounts to himself, his auto-repair company, and Cintas, who provided uniforms for Chip's auto-repair company. These checks totaled $5,610. Of this amount, $1,150 noted in the check memo line, or were testified to by Chip, as being for food and gas. Another $1,000 was for labor Chip performed installing a water systems and pump in Margaret's house. Margaret was aware that Chip and Rita would purchase groceries and medicine for her, sometimes with their own funds, and Margaret would reimburse them for such expenses.

[15] Between May 2009 and January 2011, Chip, acting as attorney-in-fact, wrote an additional $2,766 of checks and traveler's checks from Margaret's account to Rita. Although some contained memo notes that they were for items purchased for Margaret, others contained no notation. Furthermore, during 2011, checks totaling $4,989 were written, purportedly by Margaret, to Rita without any notation or other record of their purpose. The checks to Rita increased in frequency and amount as Margaret's condition worsened. Although all of the checks bear the name of Margaret as signor, the signatures were not the same on all of the checks. As noted by the trial court, however, no handwriting

analysis was submitted into evidence. However, Rita did admit to writing her own name on the payee line on all of Margaret's checks written to her.

[16]    On May 1, 2009, Margaret visited her family physician, Dr. Michael Chitwood ("Dr. Chitwood"). During this visit, Margaret was confused and not oriented as to time, i.e., Margaret thought the year was 1996. Dr. Chitwood concluded that Margaret had dementia but could still live at home with the assistance of Chip and Rita.

[17]    On July 2, 2010, Margaret signed a quitclaim deed that conveyed her home and real property to herself, Chip, and Rita. The attorney who prepared the deed never met Margaret and did not have any opportunity to speak with her privately about the deed. One week after executing the deed, Margaret again visited Dr. Chitwood. Margaret did not want to eat or drink and was not motivated.  She was withdrawn, depressed and had "psychomotor slowing," i.e., slowing of thought processes. These were not usual symptoms for Margaret. During testing, she could not read something and repeat it five minutes later. She also did not know what day it was or who was president. Dr. Chitwood diagnosed Margaret with mild to moderate dementia.

[18]    On September 2, 2011, when Margaret was in hospice care near death, Chip, acting as Margaret's attorney-in-fact, added his name to Margaret's bank accounts as a joint owner with right of survivorship. Margaret was not present when Chip did this.

Margaret died on October 18, 2011. Ten days later, Chip filed an application for consent to transfer the balance of Margaret's accounts to his own accounts. The balance transferred from Margaret's savings account was $42,902.74, and the balance on the checking account was $663.04.

## Procedural History

On November 16, 2011, the Brown Circuit Court appointed John as the personal representative of Margaret's supervised Estate. On December 19, Rita submitted a claim to the Estate for $205,520, for reimbursement for care and services she provided to Margaret. Rita claimed that she had cared for Margaret sixteen hours per day for four days per week through April 2009, then sixteen hours per day for every day from May 2009 to October 17, 2011. Rita later admitted that she had worked at the grocery store until March 2010. Thus, prior to that date, she could not have provided sixteen hours of care per day for Margaret. She also admitted that she did not deduct any of the time she spent caring for Chip from the time she claimed she was caring for Margaret. Rita later indicated that she abandoned this claim against the Estate.

Also on December 19, 2011, the Estate filed a claim against Chip and Rita alleging that they had exercised undue influence over Margaret. The complaint sought an order declaring the quitclaim deed void and recovery of the funds received by Chip and Rita in addition to treble damages, costs, and attorney fees. A bench trial was held on May 27 – 28, 2014. At the conclusion of the trial, the trial court took the matter under advisement, and on October 3, 2014, the trial court issued *sua sponte* findings of fact and conclusions of law. The trial

court found a presumption of undue influence existed with regard to the financial transactions between Margaret and Chip and Rita. The court also found that Chip and Rita had not rebutted this presumption and ordered them to pay to the Estate: $43,565.78 as reimbursement for Margaret's checking and savings account balances; $700 as reimbursement for checks written by Chip to Rita from Margaret's account; and $4,989 in checks and $550 in traveler's checks to Rita purportedly bearing Margaret's signature. The trial court also ordered that the quitclaim deed be set aside and that Margaret's real estate be transferred back to the Estate.

Chip and Rita filed a motion to correct error on November 3, 2014. The trial court set a hearing on the motion to be heard on January 14, 2015. The Estate then filed a motion to strike certain affidavits filed with the motion to correct error. At the January 14 hearing, the trial court considered both motions. On February 17, the trial court entered an order granting the Estate's motion to strike and denying the Defendant's motion to correct error. On March 18, 2015, Chip and Rita filed their notice of appeal, and this appeal ensued. Additional facts will be provided as necessary.

## Standard of Review

Neither party requested that the trial court enter specific findings and conclusions. Under such circumstances, our standard of review is well settled:

> Where, as here, the trial court enters findings of fact and conclusions there on without an Indiana Trial Rule 52 written request from a party, the entry of findings and conclusions is

considered to be sua sponte. Where the trial court enters specified findings sua sponte, the findings control our review and the judgment only as to the issues those specific findings cover. Where there are no specific findings, a general judgment standard applies, and we may affirm on any legal theory supported by the evidence adduced at trial.

A two-tier standard of review is applied to the sua sponte findings and conclusions made: whether the evidence supports the findings, and whether the findings support the judgment. Findings and conclusions will be set aside only if they are clearly erroneous, that is, when the record contains no facts or inferences supporting them. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. In conducting our review, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. We will neither reweigh the evidence nor assess witness credibility.

*Samples v. Wilson*, 12 N.E.3d 946, 949-50 (Ind. Ct. App. 2014) (citations and internal quotations omitted).

## Discussion and Decision

[24] Chip and Rita argue that the trial court erred by shifting the burden of proof to them to prove that the transaction involving the deed was not the result of undue influence. We disagree.

### A. *Presumption of Undue Influence*

[25] In Indiana, certain legal and domestic relationships raise a presumption of trust and confidence as to the subordinate party on the one side and a corresponding influence as to the dominant party on the other. These relationships include,

but are not limited to: attorney and client, guardian and ward, principal and agent, pastor and parishioner, husband and wife, and parent and child. *In re Estate of Allender*, 833 N.E.2d 529, 533 (Ind. Ct. App. 2005), *trans. denied*. In such cases, the law will impose a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and thus void, if the plaintiff's evidence establishes: (1) the existence of such a relationship, and (2) that the questioned transaction between those parties resulted in an advantage to the dominant person in whom trust and confidence was reposed by the subordinate. *Id*. Once the plaintiff's evidence establishes these two elements, the burden of proof then shifts to the dominant party who must demonstrate by clear and unequivocal proof that the questioned transaction was made at arm's length and thus valid. *Id*.

[26]     In a parent-child relationship, the parent is generally considered to be the dominant party. *Id*. However, in many cases involving elderly or otherwise infirm parents being cared for by their children, it is the child who is considered to be the dominant party. *See id*. at 533-34 (holding that son was in a dominant position vis-à-vis his parents due to his ailing parents' caretaker); *see also Meyer v. Wright*, 854 N.E.2d 57, 60 (Ind. Ct. App. 2006) (holding that son was in the dominant position over his ailing father by reason of being his father's caretaker), *trans. denied*; *Outlaw v. Danks*, 832 N.E.2d 1108, 1111 (Ind. Ct. App. 2005) (holding that nephew who was sole caretaker of his elderly, ailing aunt had a fiduciary relationship to her which raised a presumption of undue influence).

[27] Here, the Estate presented evidence that Chip and Rita were the dominant party in their relationship with Margaret. Ample evidence existed that Margaret's mental abilities were in decline. Her family doctor diagnosed her with mild dementia, and a neurologist diagnosed her with at least moderate dementia. She had trouble remembering the year and her location. The neurologist testified that, in his opinion, Margaret did not have the mental capacity to make legal and financial decisions for herself while she was in his care. He also testified that Margaret's condition did not improve while she was in the nursing home. In the later years of her life, Margaret was almost completely dependent upon Chip and Rita to take care of her. Moreover, after Chip and Rita moved in with Margaret, her contact with other members of the family was restricted. Laurie was not allowed to visit the home, and her son John's visits were limited and monitored. From this evidence, the trial court was well within its discretion to conclude that Chip and Rita were in a dominant position vis-à-vis Margaret.

[28] The next issue we must address is whether any transactions involving Chip and/or Rita on the one hand and Margaret on the other resulted in an advantage to Chip and Rita, as the parties in whom trust and confidence was reposed by Margaret. *See In re Estate of Allender*, 833 N.E.2d at 533. In general, the parties break the transactions into two main groups: the quitclaim deed granting Margaret's real property to Margaret, Chip, and Rita as joint owners, and the checks written on Margaret's accounts to Chip and Rita.

## B.  Quitclaim Deed

With regard to the deed, the Defendants argue no evidence exists that the transaction was detrimental to Margaret's interests because she remained a joint owner and continued to live on her own property. This is in response to the trial court's citation to *Folsom v. Buttolph*, 82 Ind. App. 283, 143 N.E. 258, (1924), in which the Appellate Court held that the presumption of undue influence arises "if the transaction results beneficially to the person charged, *and detrimentally to the person in whose name the act was done*[.]" (emphasis added).

More recent opinions of this court, however, require only that the transaction at issue benefit the dominant party. *See In re Estate of Allender*, 833 N.E.2d at 533. Even if *Folsom* was controlling, we cannot say that the transaction involving the quitclaim deed did not act to the detriment of Margaret. By means of the quitclaim deed, Margaret went from being the sole owner of her home and real property to a joint owner. Thus, the transaction was to Margaret's detriment. *See In re Estate of Rickert*, 934 N.E.2d 726, 730 (Ind. 2010) (holding that burden was on attorney-in-fact to prove by clear and convincing evidence that her use of her power of attorney to create accounts giving her joint ownership with rights of survivorship over decedent's financial accounts was voluntary and fair). Here, the benefit to Chip and Rita is obvious—they obtained not only the joint interest in the property but also the right of survivorship over Margaret's house and real property upon her death.

Chip and Rita further argue, however, that the law does not apply a presumption of undue influence when a transaction is made between a parent

and a child. In *Crider v. Crider*, 635 N.E.2d 204, 212-13 (Ind. Ct. App. 1994), the court noted that our supreme court court has held "'that no presumption of fraud or undue influence arises in a case of conveyance from a parent to a child on account of the mere existence of such relation.'" (quoting *Westphal v. Heckman*, 185 Ind. 88, 113 N.E. 299, 301 (1916)).

[32]　Here, the trial court did not apply the presumption of undue influence based merely on the fact that the transaction involved a parent and child. The trial court did so because the evidence amply demonstrated that Chip and Rita were, as noted above, in a dominant position over an ailing Margaret who was suffering from dementia at the time.[1]

[33]　We therefore find Chip and Rita's reliance on *Baker v. McCague*, 118 Ind. App. 32, 75 N.E.2d 61 (1947) (en banc), to be misplaced. In *Baker*, the decedent, an eighty-two-year-old widow, was cared for by her daughter. The decedent deeded to this daughter (and another daughter) certain real property, reserving for herself the rents, profits, and income during her lifetime. Upon the

---

[1] The Estate also argues that Chip was in a fiduciary relationship with Margaret because he held the power of attorney. It is generally true that holding of the power of attorney puts the attorney-in-fact in a fiduciary relationship. *See In re Estate of Allender*, 833 N.E.2d at 534; *Villanella v. Godbey*, 632 N.E.2d 786 (Ind. Ct. App. 1994). This fiduciary relationship, combined with the transfer of substantial assets, also raises a presumption of undue influence. *In Re Estate of Allender*, 833 N.E.2d at 534; *Villanella*, 632 N.E.2d at 786; *In re Estate of Wade*, 768 N.E.2d 957, 962 (Ind. Ct. App. 2002). However, as we noted in *In re Estate of Compton*, 919 N.E.2d 1181, 1187 (Ind. Ct. App. 2010), Indiana Code section 30-5-9-2(b) abrogates the common law presumption of undue influence with respect to certain transactions benefiting an attorney-in-fact. Specifically, a presumption of undue influence is now conditioned upon the attorney-in-fact's actual use of the power of attorney to effect the questioned transaction for his benefit, and the benefiting attorney-in-fact is freed from the presumption of undue influence so long as the power of attorney is unused in the questioned transaction. *Id*. Here, we affirm the trial court's judgment based on the dominant parent-child relationship and do not address the issues surrounding the presumption of undue influence for those holding the power of attorney.

decedent's death, the widow's remaining children brought an action to have the deed set aside. The trial court entered judgment against the plaintiffs. On appeal, the court affirmed, noting no presumption of undue influence existed merely because the transaction was between a parent and child. *Baker*, 118 Ind. App. at 37, 75 N.E.2d at 64. Moreover, the decedent in *Baker* had sought out an attorney on her own and called the attorney to come to her house, where she confided with him alone on two or three occasions. Only then did the attorney prepare the deed at issue. Both the widow's attorney and physician testified that she was competent at all times. *Id.*

[34] The facts in the present case are markedly different, where Margaret's physician's testified as to her mental frailty, and where Margaret never even met the attorney who prepared the quitclaim deed. Nor can we ignore the evidence that other family members were kept away from Margaret and that Chip and Rita treated Margaret's money as their own.

[35] The same is true for the Defendant's citation to *Teegarden v. Lewis*, 145 Ind. 98, 44 N.E. 9, 12 (1895). In that case, the court declined to apply a presumption of undue influence where the evidence established only that the daughter had discharged her moral obligation to house and care for her "aged, weak and childish" father. First, *Teegarden* is a rather old case. Even though it has not been overruled, it is clear that the law regarding the presumption of undue influence has evolved over the past century. Indeed, the court in *Teegarden* seemed hostile to the notion of applying the presumption of undue influence to a gift from a parent to a child. *See Teegarden*, 145 Ind. 98, 44 N.E. at 12 ("The

relation of parent and child, as to presumption of fraud, and the onus of proof to rebut the same, in business transactions between them, does not stand upon the same footing as the relation of trustee and *cestui que* trust, guardian and ward, attorney and client, principal and agent, and the like relations."). Since *Teegarden*, however, our courts have applied this presumption where the evidence shows that the child was in the dominant position over the parent. *See In re Estate of Allender*, 883 N.E.2d at 533-34; *Meyer*, 854 N.E.2d at 60. Again, the record here contains evidence that Chip and Rita were in a dominant position over Margaret, kept her away from other members of the family, and used her money as their own.

[36] Under these facts and circumstances, the trial court did not clearly err in applying the presumption of undue influence with regard to the transaction involving the quitclaim deed. Therefore, the trial court properly placed on Chip and Rita the burden of rebutting the presumption of undue influence by clear and convincing evidence. *See In re Estate of Allender*, 833 N.E.2d at 533. This they did not do. In fact, they do not even argue that they successfully rebutted the presumption; they claim merely that the trial court erred in applying the presumption.

[37] Still, we acknowledge some evidence might have supported a finding that Margaret deeded her real property to Chip and Rita as a natural expression of her bounty to the son and daughter-in-law who took care of her during her waning years. However, this is evidence that does not favor the trial court's judgment. Considering only the evidence favorable to the trial court's judgment,

as we must do on appeal, the trial court could reasonably conclude that Chip and Rita did not rebut the presumption of undue influence by clear and convincing evidence.

*B. Checks and Traveler's Checks*

[38] Chip and Rita make many of the same arguments regarding the trial court's order for Rita to repay the Estate for $4,989 in checks and $500 in traveler's checks written on Margaret's accounts to Rita.

[39] First, the Defendants claim that the trial court should not have shifted the burden to the them to rebut the presumption of undue influence. However, as noted above, evidence before the court suggested that Chip and Rita were in a dominant position vis-à-vis Margaret.[2] Moreover, it is apparent that Rita benefitted from the checks and traveler's checks written to her. Accordingly, the trial court correctly applied the presumption of undue influence, and the burden then shifted to Rita to rebut this presumption. *See In re Estate of Allender*, 833 N.E.2d at 533.

---

[2] The fact that Rita was Margaret's daughter-in-law is of no help to Rita. As explained in *In re Estate of Allender*, a fiduciary may not escape the presumption of undue influence simply by funneling the benefits of transactions to his family members. 833 N.E.2d at 534 (citing *In re Estate of Wade*, 768 N.E.2d 957, 964 (Ind. Ct. App. 2002), *trans. denied*). Chip was in the dominant position with Margaret; Rita was Chip's wife; and Rita benefitted from the transactions. This is sufficient to impose the presumption of undue influence. *See id*.

[40] Other than her own testimony, which the trial court was under no obligation to credit or give substantial weight, Rita provided little to nothing to rebut the presumption.

[41] Instead, the evidence supported the trial court's decision that the presumption of undue influence was not rebutted by clear and convincing evidence. With regard to the bank checks, they were written to Rita from Margaret's accounts with no notation as to their purpose. Moreover, as noted by the trial court, the signatures on the checks are inconsistent. With regard to the traveler's checks, Rita's testimony raised at least an inference that she was not being forthright. We refer specifically to Rita's initial denials of ever having received the traveler's checks. *See* Tr. p. 291. She also claimed not to know where Margaret kept her traveler's checks. *Id.* at 295. Later in her testimony, however, Rita acknowledged that she had cashed the traveler's checks but claimed to have forgotten about them. *Id.* at 292-93. She also claimed that Margaret had kept her traveler's checks in her purse and gave them to her when she was in the nursing home. *Id.* at 297.

[42] In short, the trial court did not err in determining that the evidence presented by the Estate raised a presumption of undue influence due to Chip and Rita's dominant position vis-à-vis Margaret and their having received benefits from the transactions involving Margaret. Also, the trial court did not clearly err in

determining that Chip and Rita did not rebut this presumption by clear and convincing evidence.[3]

## Conclusion

[43] The trial court did not clearly err when it applied the presumption of undue influence with regard to the transactions between Chip and Rita on the one hand and Margaret on the other. Nor did the trial court clearly err when it concluded that Chip and Rita did not rebut this presumption by clear and convincing evidence. Accordingly, we affirm the judgment of the trial court.

[44] Affirmed.

Baker, J., and Bailey, J., concur.

---

[3] The Defendants also claim that the trial court erred to the extent that it invalidated the transactions based upon a finding that Margaret was mentally unsound. We consider the trial court's findings regarding Margaret's diminished mental abilities as informing the trial court's determination that Chip and Rita were in a dominant position over Margaret, not as a separate basis for invalidating the transactions at issue. As discussed, sufficient evidence supports the trial court's judgment in this regard.